## STATE OF CONNECTICUT *v.* DONALD COLE
## (AC 17617)

*Foti, Lavery and Daly, Js.*

Argued June 2—officially released September 15, 1998

*Neal Cone*, assistant public defender, for the appellant (defendant).

*Mitchell S. Brody*, assistant state's attorney, with whom, on the brief, were *Maureen Keegan*, acting state's attorney, and *John A. Connelly*, former state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Donald Cole, appeals from the judgment of conviction, following a jury trial, of one count of murder in violation of General Statutes § 53a-54a (a).[1] Following his conviction, the trial court

---

[1] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to

sentenced the defendant to a total effective term of sixty years imprisonment. On appeal, the defendant claims that the trial court violated his due process rights by failing to require the state to disprove his insanity defense beyond a reasonable doubt. The defendant also claims that the trial court improperly (1) refused to instruct the jury that the "wrongfulness" component of the insanity defense includes standards of societal morality, (2) instructed the jury as to the consequences for the defendant of an acquittal based on the insanity defense, (3) refused to instruct the jury on adverse inferences that could be drawn from the state's failure to offer psychiatric evidence to rebut his insanity defense, and prohibited defense counsel from suggesting to the jurors that they should draw such inferences and (4) prohibited testimony from a defense expert of the consequences for the defendant of an acquittal based on the insanity defense. We disagree and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On December 9, 1993, at approximately 8 p.m., the defendant telephoned Susan Hellwinkle at her home in Woodbury. The defendant told Hellwinkle that he had shot his girlfriend twice and that she was dead. After hanging up with the defendant, Hellwinkle immediately telephoned the police to report the defendant's statements. Shortly thereafter, state police from Troop L in Litchfield were dispatched to the defendant's residence in Woodbury. Upon arriving at the defendant's residence, the police took up positions surrounding the house. William Longo, a sergeant with the state police, telephoned the defendant from outside of the house

be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

and instructed the defendant to come out of the front door with his hands empty and in plain view. The defendant opened the front door and stepped onto the front porch. After the defendant stepped onto the front porch, Pete Warren, a lieutenant with the state police, gave the defendant further instructions as to how to surrender. The defendant followed Warren's instructions and was handcuffed by Trooper David Bland.

After turning over the defendant to other troopers, Longo and Bland entered the house through the front door and proceeded to a master bedroom at the end of a hallway. Upon entering the bedroom, the police discovered the victim on the floor at the foot of the bed. The victim was fully clothed, lying on her back. The top half of the victim's torso was wrapped in a blanket that was folded across her face. There were numerous tears in the upper part of the victim's blouse and a wound to the victim's face. The plastic casing from a discharged shotgun shell was entwined in the victim's hair. There was a small amount of blood splattered on the wall across from the victim. There were also bloody drag marks from the wall to the foot of the bed. In one of the bedroom walls, behind an undamaged poster, were three bullet holes surrounded by splattered blood and hair. A discharged shotgun shell was found under bloodstained clothes in a laundry basket. Another discharged shotgun shell was found at the foot of the bed. There was a pool of blood on the bedroom floor beneath a red flannel shirt. A twelve-gauge shotgun was found in the closet of a second bedroom. Forensic testing revealed that the discharged shotgun shells found in the master bedroom had been ejected from this shotgun.

Ira Kanfer, a forensic pathologist with the state medical examiner's office, conducted an autopsy of the victim. Kanfer's examination revealed a gunshot wound to the victim's chest with the bullet traveling upward

and lodging in the victim's brain. Kanfer's examination also revealed a second gunshot wound to the victim's neck with the bullet traveling downward and exiting through her back. Kanfer stated that the gunshot to the neck occurred first and that the second shot occurred while the victim was on the floor. Kanfer attributed the victim's death to multiple gunshot wounds.

While the police were searching the defendant's residence, the defendant was brought inside and calmly stated: "It was self-protection. She was yelling at me." The defendant also stated that the victim had swung the shotgun at him and that he had to protect himself. In addition, the defendant stated: "I'm not going to let anyone come in and push me around. I have my gun." Later, while the police were transporting the defendant to the state police barracks in Litchfield, he stated that the victim was fighting him like a man, had threatened to kick him in the groin and was going to get the shotgun and kill him. After arriving at the barracks, the defendant stated that the victim was going to kill him and was trying to take over his life. The defendant also stated that the victim had told him that he was unfit to raise his children and that he had been aggravated into killing her.

The defendant testified as follows. Approximately one month prior to the incident, the victim, who had been living with the defendant, moved out of the defendant's home and was living in New Milford. On December 9, 1993, at approximately 4 p.m., the victim telephoned the defendant and asked if she could come over for dinner. The defendant agreed to have the victim over for dinner with him and his three children. The victim arrived after the defendant and his children had finished eating and ate alone in the kitchen while the defendant watched his children playing in the basement. After approximately fifteen minutes, the victim angrily called downstairs to the defendant: "Get your

ass up here or I'm going to kill you." The defendant went upstairs to the master bedroom and the victim asked him why she had to work for a living and pay her own rent. The defendant responded that it was not his responsibility to take care of her. The defendant told the victim that it was best for her to move out, that they were stuck in a rut and that she should go home. The victim became upset with the defendant and began slapping and kicking him. The defendant told her to stop and to get out of the house. The victim said that she knew the defendant had a loaded shotgun in the bedroom closet and that she was going to shoot him with it. The defendant removed the shotgun from the closet and told the victim that she was not going to get any guns and that she should get out of the house. The victim again slapped and kicked the defendant. The defendant backed up approximately five feet and pointed the shotgun at the victim. The defendant turned off the safety mechanism and fired two shots at the victim. The first shot was fired when the victim was standing and the second as the victim fell. The defendant stated that he did not intend to kill the victim and characterized his conduct as a subconscious reaction. Although the defendant acknowledged that the victim never touched the shotgun, he said that he was trying to protect himself because he was convinced that the victim would shoot him if she could get her hands on the gun. The defendant also said, however, that he had not shot the victim in self-defense and that he was incorrect in previously having thought that he had. In addition, the defendant stated that he did not know what made him shoot the victim.

I

The defendant first claims that the trial court violated his due process rights by failing to require the state

to disprove his insanity defense beyond a reasonable doubt.[2] We disagree.

The defendant concedes that this claim was not properly preserved at trial and seeks review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). "In *Golding*, the court held: '[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt.' " (Emphasis in original.) *State* v. *Perry*, 48 Conn. App. 193, 203 n.7, 709 A.2d 564, cert. denied, 244 Conn. 931, 711 A.2d 729 (1998). "The first two questions relate to whether a defendant's claim is reviewable, and the last two relate to the substance of the actual review." (Internal quotation marks omitted.) *State* v. *Manfredi*, 17 Conn App. 602, 621, 555 A.2d 436 (1989), aff'd, 213 Conn. 500, 569 A.2d 506, cert. denied, 498 U.S. 818, 111 S. Ct. 62, 112 L. Ed. 2d 37 (1990). Because the defendant's claim is of constitutional magnitude and the record adequate to review it, we will review the claim. It fails, however, under the third requirement of *Golding*.

The defendant argues that because his sanity is presumed, once he offered evidence in support of a defense

---

[2] The first issue is stated by the defendant in his brief as follows. "When deciding whether to acquit the defendant because of insanity, the jury has yet to decide to hold him criminally responsible, and so the presumption of innocence has not yet been rebutted, meaning the reasonable doubt standard still applies; also, because the state presumes sanity, once [the defendant] has offered evidence in rebuttal, shifting the burden of persuasion to him violates due process and Conn. Const., article first, § 9."

of insanity, the state was required to disprove his defense beyond a reasonable doubt. Moreover, the defendant claims that the effect of an insanity defense is that the presumption of innocence, which is rooted in the due process principles of the federal and state constitutions, remains in effect after the state has satisfied its burden of proof as to the elements of murder, and requires the state to disprove the defendant's insanity defense beyond a reasonable doubt.

The defendant's claim is controlled by our Supreme Court's decision in *State* v. *Joyner*, 225 Conn. 450, 625 A.2d 791 (1993). In *Joyner*, the defendant claimed that "in making mental disease an affirmative defense on which the defendant bears the burden of proof, [General Statutes] § 53a-13 (a), as amended in 1983, violates the due process clauses contained in article first, §§ 8 and 9 of the Connecticut constitution."[3] *State* v. *Joyner*, supra, 457. Although in *Joyner* the court did not consider the constitutionality of § 53a-13 (a) under the federal due process clause, it relied on two decisions of the United States Supreme Court for the proposition that a defendant's sanity is not an element of the state's case in a criminal prosecution and, therefore, the state need not bear the burden of proof on that issue. Id., 458, citing *Patterson* v. *New York*, 432 U.S. 197, 205–206, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977), and *Leland* v. *Oregon*, 343 U.S. 790, 797–99, 72 S. Ct. 1002, 96 L. Ed. 1302 (1952). In *Joyner*, the court stated that "[w]e agree with the state that sanity . . . is an independent fact and not an element of any existing criminal offense. As to such an independent fact, as with regard to other affirmative defenses, the legislature has the constitutional authority to allocate the burden of proof to the

---

[3] General Statutes § 53a-13 (a) provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

defendant rather than to the state." (Citations omitted.) *State* v. *Joyner,* supra, 464–65.

"We are, of course, bound by the decisional law of our Supreme Court. *State* v. *Reis,* 33 Conn. App. 521, 527, 636 A.2d 872, cert. denied, 229 Conn. 901, 640 A.2d 118 (1994)." *State* v. *Tangari,* 44 Conn. App. 187, 195 n.8, 688 A.2d 1335, cert. denied, 241 Conn. 901, 693 A.2d 304, cert. denied, 522 U.S. 867, 118 S. Ct 177, 139 L. Ed. 2d 118 (1997). Because our Supreme Court has determined that the legislature has the constitutional authority to allocate the burden of proof on sanity to the defendant rather than to the state, when sanity is not an element in the charge against the defendant, the defendant's claim does not satisfy the third requirement of *Golding.*

## II

The defendant next claims that the trial court improperly refused to instruct the jury that the "wrongfulness" component of the insanity defense includes standards of societal morality. We disagree.

The defendant filed a request to charge seeking an instruction that "[a defendant] is not criminally responsible for his offending act if, because of mental disease or defect, he believes that he is morally justified in his conduct—even though he may appreciate that his act is criminal. A defendant lacks substantial capacity to appreciate the wrongfulness of his conduct if he knows his act to be criminal but commits it because of a delusion that [he is acting in] self-defense and [is] therefore justified." The trial court declined to give the instruction requested by the defendant and instead instructed the jury that "it shall be an affirmative defense that the defendant at the time he committed the proscribed act or acts lacked substantial capacity . . . as a result of mental disease or defect either to appreciate the wrongfulness of his conduct or to control his conduct within

the requirements of the law." See General Statutes § 53a-13 (a).

The defendant relies on our Supreme Court's decision in *State* v. *Wilson*, 242 Conn. 605, 700 A.2d 633 (1997), to support his claim that he was entitled to a jury instruction that defined the term "wrongfulness" in § 53a-13 (a) in accordance with standards of societal morality. In *Wilson*, our Supreme Court stated that "a defendant does not truly appreciate the wrongfulness of his conduct as stated in § 53a-13 (a) if a mental disease or defect causes him both to harbor a distorted perception of reality and to believe that, *under the circumstances as he honestly perceives them*, his actions do not offend societal morality, even though he may also be aware that society, *on the basis of the criminal code*, does not condone his actions." (Emphasis in original; internal quotation marks omitted.) Id., 622. The court stated that a defendant is entitled to an instruction defining the term "wrongfulness" under the aforementioned standard only after he has adduced sufficient evidence to warrant such an instruction. Id., 625; see also *State* v. *Person*, 236 Conn. 342, 353, 673 A.2d 463 (1996) (defendant entitled to jury instruction on affirmative defense only if there is sufficient evidence for rational juror to find all elements of defense established by preponderance of evidence). Moreover, because an instructional omission with respect to an affirmative defense does not rise to the level of a constitutional violation, the defendant must prove that the omission constituted harmful error. *State* v. *Wilson*, supra, 631–32.

At trial, the following evidence was adduced regarding the defendant's mental state at the time of the killing. Julia Ramos Grenier, a psychologist, testified that at the time of the killing, the defendant was suffering from a delusional disorder that prevented him from understanding that his behavior was not in keeping with what

was expected by the law and by society. In addition, the defendant testified that he did not consider the consequences of his actions when he fired the gun and that he acted "subconsciously." Moreover, the defendant testified that he had not acted in self-defense and that he was incorrect in having thought that he had and in making statements to that effect.

The following additional evidence was adduced regarding the defendant's mental state. Shortly after the killing, the defendant telephoned Hellwinkle and told her that he did a very bad thing. The defendant testified that very soon after the killing, he realized that he had done something "wrong" and that he "was probably in for a lot of trouble." The defendant also admitted that he had moved a poster to cover the bullet holes in the bedroom wall.

On the basis of that evidence, we conclude that the defendant failed to present sufficient evidence to warrant an instruction that distinguished between legal and societal standards of wrongfulness under § 53a-13 (a). Although the defendant presented evidence that he suffered from a mental disease that caused him to misperceive reality,[4] the only evidence that directly linked the defendant's mental disease with his ability to appreciate the wrongfulness of his actions at the time of the killing came from Grenier. Grenier testified that at the time of the killing, the defendant's mental disease prevented him from understanding that his behavior was not in keeping with what was expected *by the law and by society*. The evidence presented by the defendant, therefore, supports the theory that at the time of the

---

[4] Among the evidence presented by the defendant was the testimony of Walter Borden, a psychiatrist, that the defendant suffered from chronic paranoid schizophrenia. Borden testified that the defendant's schizophrenia resulted in paranoid delusions, one of which was the belief that the victim was trying to kill him.

killing he was not aware of any standards of wrongfulness, either legal or societal, and that it was only after the killing that he realized that his actions were both illegal and immoral.

Because the defendant failed to present any evidence that at the time of the killing he was aware that his actions were illegal but believed that they did not offend societal morality, we conclude that the defendant was not entitled to a jury instruction that distinguished between legal and societal standards of wrongfulness under § 53a-13 (a).

Furthermore, the defendant has not satisfied his burden of persuasion that the trial court's instructional omission constituted harmful error. See *State* v. *Beltran*, 246 Conn. 268, 275–76, 717 A.2d 168 (1998) (defendant must persuade this court that it is more probable than not that trial court's instructional omission affected result of trial); *State* v. *Wilson*, supra, 242 Conn. 631–32 (same); see also *State* v. *Esposito*, 235 Conn. 802, 825, 670 A.2d 301 (1996). Unlike in *Wilson*, where the evidence established that the defendant was aware that his actions were criminal but believed that he was compelled by a "higher moral duty" to kill the victim; *State* v. *Wilson*, supra, 626; here, the defendant did not present any evidence that at the time of the killing he appreciated the illegality or criminality of his actions. The success of the defendant's affirmative defense, therefore, did not hinge on whether the jury found that at the time of the killing he was aware that his actions offended societal morality. Compare id., 632 (failure to define "wrongfulness" in terms of morality harmful error where defendant's appreciation of criminal law not at issue).

Because the defendant did not present evidence that at the time of the killing he understood the illegality of his actions, the success of his affirmative defense did

not hinge on his appreciation of the morality of his actions. We conclude, therefore, that the trial court's instructional omission did not constitute harmful error.

III

The defendant next claims that the trial court improperly instructed the jury as to the consequences for the defendant of an acquittal based on the insanity defense. We disagree.

General Statutes § 54-89a provides in relevant part: "If the court instructs the jury on a defense of mental disease or defect . . . it shall . . . inform the jury of the consequences for the defendant if he is found not guilty by reason of mental disease or defect and of the confinement and release provisions of sections 17a-580 to 17a-602, inclusive, applicable to a person found not guilty by reason of mental disease or defect." The defendant argues that the trial court's instructions failed to refer specifically to the confinement and conditional release provisions of General Statutes § 17a-593 (c)[5] and (g),[6] and General Statutes § 17a-594 (a).[7] The defendant

[5] General Statutes § 17a-593 (c) provides: "If reasonable cause exists to believe that the acquittee remains a person with psychiatric disabilities or mentally retarded to the extent that his discharge at the expiration of his maximum term of commitment would constitute a danger to himself or others, the state's attorney, at least one hundred thirty-five days prior to such expiration, may petition the court for an order of continued commitment of the acquittee."

[6] General Statutes § 17a-593 (g) provides: "The court shall make a finding as to the mental condition of the acquittee and, considering that its primary concern is the protection of society, make one of the following orders: (1) If the court finds that the acquittee is not a person who should be discharged, the court shall order the recommendation or application for discharge be dismissed; or (2) if the court finds that the acquittee is a person who should be discharged, the court shall order the acquittee discharged from custody. The court shall send a copy of such finding and order to the [psychiatric security review] board."

[7] General Statutes § 17a-594 (a) provides in relevant part: "If at any time while an acquittee is under the jurisdiction of the [psychiatric security review] board, it appears to the board or its chairman that a conditionally

argues that the trial court's omission permitted the jury to convict him on the basis of an erroneous belief that he would be released from confinement prematurely if the jury returned a verdict of not guilty by reason of mental disease or defect.

Our Supreme Court has stated that "[a]t common law, the matter of punishment was not an issue for the jury but for the court, and therefore not an appropriate subject for the jury's consideration or for the court's instruction to the jury. *State* v. *Holmquist*, [173 Conn. 140, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977)]. Section 54-89a, enacted in derogation of this common law principle, is to be construed narrowly in order to leave undisturbed those aspects of the common law not directly affected by the statute. *State* v. *Kish*, 186 Conn. 757, [764], 443 A.2d 1274 (1982). Section 54-89a requires only that the court inform the jury of the consequences that may follow a verdict rendered after a successful insanity defense. It does not nullify the general rule that a jury base [its] verdict solely on the evidence before it. A narrow construction of § 54-89a comports with this general rule by ensuring that the jury possesses information that enables it to reach a determination based on the evidence, yet remains unaffected by sympathy, fear or other inappropriate and irrelevant concerns." *State* v. *Wood*, 208 Conn. 125, 144, 545 A.2d 1026, cert. denied, 488 U.S. 895, 109 S. Ct. 235, 102 L. Ed. 2d 225 (1988).

released acquittee has violated the terms of a conditional release or that the mental health of the acquittee has changed, the board or its chairman may order the modification of the conditional release of the acquittee or may order the termination of the conditional release of the acquittee and his return to a hospital for psychiatric disabilities or to the Commissioner of Mental Retardation for examination or treatment. The state's attorney may, at any time, notify the board or its chairman of facts that the state's attorney believes indicate that the conditionally released acquittee has violated the terms of a conditional release, that the mental health of the acquittee has changed or that the conditions of release should be modified. . . ."

In *Wood,* the court agreed that the trial court was " 'directed by the legislature to make it clear to the jury that such a verdict [of guilty but not criminally responsible] means neither freedom nor punishment. It means the accused will be confined in a hospital for the mentally ill, until the superintendent of such hospital certifies and the Court is satisfied that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others.' " Id., 142 n.13. The court noted that the effect of the instruction is "to promote verdicts grounded on the evidence, rather than on the fear of an uninformed jury that a dangerous, disturbed person might be set free upon the rendering of a verdict of guilty but not criminally responsible." Id.

After instructing the jury on the affirmative defense of mental disease or defect, the trial court instructed the jury of the consequences for the defendant if he is found not guilty pursuant to the affirmative defense. The trial court instructed the jury that the defendant would be temporarily confined to a state hospital for an examination to determine his mental condition. After receiving a report from the superintendent of the hospital, the court would conduct a hearing to determine the mental condition of the defendant, with the primary concern being the protection of society. The court would then make a determination as to whether the defendant should be confined, conditionally released or discharged. If the court were to order that the defendant be confined, he would then be committed to the psychiatric security review board for confinement in a state mental institution. The trial court also instructed the jury that it would set a maximum period of confinement. In addition, the trial court twice instructed the jury that it would discharge the defendant only "if the evidence indicates that the defendant is not a threat to himself or others and the protection of society would not be adversely affected by his release . . . ." Finally,

the trial court instructed the jury that, during the course of any commitment, the court would maintain supervision of the defendant and would hold him "until such point as he is no longer a danger to himself or others . . . ."

Although the trial court's instructions did not refer specifically to the provisions of § 17a-593 (c) and (g), and § 17a-594 (a), we conclude that the court's omission did not mislead the jury to believe that the defendant would be released from confinement prematurely if it returned a verdict of not guilty by reason of mental disease or defect. Rather, the effect of the court's instructions was to inform the jury of the consequences of a successful insanity defense and to allay the jurors' fears that the defendant could be released while he is a danger to society. We conclude, therefore, that the trial court's instructions satisfied the requirements of § 54-89a and properly informed the jury of the consequences of a verdict of not guilty by reason of mental disease or defect.

## IV

The defendant next claims that the trial court improperly refused to instruct the jury on adverse inferences that could be drawn from the state's failure to offer psychiatric evidence to rebut his insanity defense and prohibited defense counsel from suggesting to the jurors that they should draw such inferences. Specifically, the defendant argues that the prosecutor's decision not to have the defendant examined by its own psychiatrist "ought to permit defense counsel to suggest that the state did not . . . have the defendant submit to an examination by a psychiatrist retained by it because the state was afraid of what that examination would [reveal]. . . . It should also permit a charge encompassing that possibility or probability." We disagree.

The defendant filed a request to charge seeking the following instruction. "The prosecutor may request the Court to order the defendant to submit to a psychiatric examination by a psychiatrist designated for this purpose by the prosecuting authority. No psychiatrist was called by the prosecuting authority as a witness in this case. You may draw such inferences as you find reasonable from these facts or you may choose to draw no inferences at all." In support of this instruction, the defendant relied on, inter alia, Practice Book § 760, now § 40-19, and *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960). The trial court refused to give the requested instruction, stating, "I am not going to charge in the specific language indicated here . . . . I don't see this as a *Secondino* situation at all." The trial court, however, did permit defense counsel to argue to the jury that the only expert testimony offered on the issue of the defendant's mental condition came from the defense.

"The failure to produce a witness for trial who is available and whom a party would naturally be expected to call warrants an adverse inference instruction against the party who would be expected to call that witness. . . . An inquiry into the appropriateness of a *Secondino* instruction is, accordingly, two-pronged: whether the witness is available and whether, under the facts of this case, the witness is one whom the state would naturally be expected to produce. . . . *State* v. *Wood*, [supra, 208 Conn. 140]. A witness who would naturally be produced by a party is one who is known to that party and who, by reason of his relationship to that party or to the issues, or both, could reasonably be expected to have peculiar or superior information material to the case which, if favorable, the party would produce. *Secondino* v. *New Haven Gas Co.*, supra, 147 Conn. 675." (Internal quotation marks omitted.) *State* v. *Oliver*, 48

Conn. App. 41, 45, 708 A.2d 594, cert. denied, 244 Conn. 930, 711 A.2d 729 (1998).

"Appellate courts will not disturb a trial court's *Secondino* ruling absent a clear abuse of the trial court's discretion. See *State* v. *Grant*, 221 Conn. 93, 106, 602 A.2d 581 (1992). In reviewing claims that the trial court abused its discretion, great weight is attached to the trial court's decision and every reasonable presumption is given in favor of its correctness. *State* v. *Beckenbach*, 198 Conn. 43, 47, 501 A.2d 752 (1985)." *State* v. *Barnes*, 47 Conn. App. 590, 594, 706 A.2d 1000 (1998).

In denying the defendant's requested instruction, the trial court stated that "in my estimation, or based on my review, [this] is not a *Secondino* situation since, number one, the defendant has not pointed to any individual who is available to the state and, under the circumstances here, bears some relation to either the parties or the issues where he would naturally be called to respond to the testimony that has been given."

The trial court correctly determined that the defendant was not entitled to a *Secondino* instruction because he failed to identify a witness who was available to the state to offer expert testimony regarding his insanity defense. See *Shelnitz* v. *Greenberg*, 200 Conn. 58, 74–75, 509 A.2d 1023 (1986) (before negative inference can be drawn from party's failure to produce witness, it must be shown that party was able to procure witness' physical presence in court). Moreover, our Supreme Court has consistently stated that the state is not required to produce expert testimony to sustain a conviction where the defense of insanity has been raised. See *State* v. *DeJesus*, 236 Conn. 189, 201, 672 A.2d 488 (1996) (fact that defendant's expert witnesses supported claim of insanity while state called no expert witnesses, but relied on cross-examination of defendant's experts, does not require determination that trier

of fact reasonably could not have concluded that defendant failed to prove insanity); see also *State* v. *Patterson*, 229 Conn. 328, 340, 641 A.2d 123 (1994); *State* v. *Medina*, 228 Conn. 281, 310, 636 A.2d 351 (1994); *State* v. *Perez*, 182 Conn. 603, 608–10, 438 A.2d 1149 (1981); *State* v. *Davis*, 158 Conn. 341, 354–56, 260 A.2d 587 (1969), vacated and remanded on other grounds, 408 U.S. 935, 92 S. Ct. 2856, 33 L. Ed. 2d 750 (1972). Because it is well settled that the state is not required to produce expert testimony to sustain a conviction where the defendant has offered expert testimony in support of a defense of insanity, it follows that expert witnesses are not witnesses that the state would naturally be expected to produce. See *Secondino* v. *New Haven Gas Co.*, supra, 147 Conn. 675.

Upon our review of the entire record, we cannot conclude that the trial court abused its discretion in refusing to instruct the jury on adverse inferences that could be drawn from the state's failure to offer psychiatric evidence to rebut the defendant's insanity defense and in prohibiting defense counsel from suggesting to the jurors that they should draw such inferences.

V

The defendant finally claims that the trial court improperly prohibited testimony from a defense expert of the consequences for the defendant of an acquittal based on the insanity defense. We disagree.

At trial, the defendant sought to offer expert testimony from Grenier of the consequences for the defendant if he were found not guilty by reason of mental disease or defect. The defendant also sought to offer Grenier's testimony regarding the operation of the psychiatric security review board, of which she is a member. The trial court refused to allow this testimony.

"Our standard of review regarding challenges to a trial court's evidentiary rulings is that these rulings will

be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . In reviewing claims that the trial court abused its discretion, great weight is given to the trial court's decision and every reasonable presumption is given in favor of its correctness. . . . We will reverse the trial court's ruling only if it could not reasonably conclude as it did. . . . *Annecharico* v. *Patterson*, 44 Conn. App. 271, 275, 688 A.2d 1341 (1997)." (Internal quotation marks omitted.) *Eisenbach* v. *Downey*, 45 Conn. App. 165, 179, 694 A.2d 1376, cert. denied, 241 Conn. 926, 696 A.2d 1264 (1997).

The defendant argues that because Grenier was not allowed to testify about either the consequences for the defendant of a verdict of not guilty by reason of mental disease or defect or about the operation of the psychiatric security review board, the jury's verdict may have been affected by fear that the defendant, if he were found not guilty by reason of mental disease or defect, could be released while he is still a danger to society. In part III of this opinion, we stated that § 54-89a, which requires the trial court to inform the jury of the consequences for the defendant of a finding of guilty but not criminally responsible, was enacted in derogation of the common-law principle that "the matter of punishment [is] not an issue for the jury but for the court, and therefore not an appropriate subject for the jury's consideration . . . ." *State* v. *Wood*, supra, 208 Conn. 144. We also stated that our Supreme Court has construed § 54-89a narrowly to comport with the general rule that a jury base its verdict solely on the evidence before it, rather than on "sympathy, fear or other inappropriate and irrelevant concerns." Id. Because § 54-89a creates a narrow exception to the general rule that a jury base its verdict solely on the evidence before it, the trial court did not abuse its discretion in prohibiting testimony from Grenier about

the consequences for the defendant of an acquittal based on the insanity defense. Furthermore, in part III of this opinion we determined that the trial court's instructions satisfied the requirements of § 54-89a and properly informed the jury of the consequences for the defendant of a verdict of not guilty by reason of mental disease or defect. We conclude, therefore, that the exclusion of Grenier's testimony did not result in substantial prejudice or injustice to the defendant.

The judgment is affirmed.

In this opinion DALY, J., concurred.

LAVERY, J., dissenting. I agree with parts I, III, IV and V of the majority opinion, but I respectfully dissent from part II of the majority opinion, which affirms the trial court's decision not to instruct the jury that the wrongfulness component of the insanity defense includes standards of societal morality.[1] I believe sufficient evidence was produced warranting the giving of the instruction.

" 'If there is sufficient evidence of a legal defense, the defendant is entitled, as a matter of law, to a requested jury charge on that defense.' *State* v. *Person*, 236 Conn. 342, 352, 673 A.2d 463 (1996). Because legal insanity is an affirmative defense for which the defendant bears the burden of proof, a defendant is entitled to receive a jury instruction on legal insanity only if he has adduced sufficient evidence from which a reasonable trier of fact could find that the defense has been established by a preponderance of the evidence. *State* v. *Joyner*, 225 Conn. 450, 471, 625 A.2d 791 (1993); see also *State* v. *Person*, supra, 353 (applying standard to

---

[1] On the basis of the defendant's request to charge, this claim is reviewable for the same reasons set forth in *State* v. *Wilson*, 242 Conn. 605, 632–33, 700 A.2d 633 (1997).

affirmative defense of extreme emotional disturbance)." *State* v. *Wilson*, 242 Conn. 605, 625, 700 A.2d 633 (1997).

At trial, the defense called two expert witnesses to testify regarding their examinations of the defendant and the conclusions drawn therefrom. Walter Borden, a psychiatrist, testified that he interviewed the defendant on three separate occasions, conducted a psychological evaluation and interviewed the defendant's parents. Borden testified that the defendant suffered from chronic paranoid schizophrenia characterized by delusions and hallucinations. According to Borden, the defendant suffered from persecutory delusions in that he believed that one or more people were at times trying to harm or kill him, somatic delusions in that he believed that he was suffering from carbon monoxide poisoning and Lyme disease, and misidentification delusion in that he believed that the victim was the double of Susan Rice, the victim. Borden explained that the defendant heard voices belonging to his coworkers and to a group that he called Semper Fi that threatened him and said he had to die. The defendant believed that there was a conspiracy to kill him.

Borden also explained that the defendant believed that there were at least two Susan Rices, a good one and a bad one. In response to the defendant's question as to whether Borden had an opinion as to the possible effect of the defendant's mental illness on his understanding of the events of December 9, 1993, Borden stated: "Well, I think they affected them profoundly in the sense that he believed he was—Susan Rice was going to harm, kill him. He heard it. He believes he heard it. He believes he heard her telling him that that's what she was going to do. And he believed that she was going to do that. Now, in my opinion that's what he believes. My opinion, he was delusional and hallucinating that he believed she was going to. He believed

that before, too, at times. So he heard her. That doesn't mean she said that. That's what he believed, that he heard her threaten him and that he believed she was going to do it and that was his understanding of what was going on. So, I think his understanding was very strongly colored, influenced, based on his paranoia, his paranoid delusions and hallucinations." Finally, in response to a question concerning his opinion as to how the mental illness affected the defendant's behavior during the events of December 9, 1993, Borden stated that the defendant's "mental state, paranoia resulted in extreme fear, fear for his life and fear directly influenced his behavior."

Julia Ramos Grenier, a psychologist, testified that she interviewed the defendant on three separate occasions and evaluated his psychological functioning. Grenier testified that the defendant believed that the victim was a double and not the same person that he had been having a relationship with and that the real Rice is alive and out there somewhere. Further, Grenier testified that the defendant attempts to present himself "as being fairly well put together" and to minimize any problems he really has, but that when he was pressured she was able to determine that he did indeed have some difficulties. She testified that the defendant was "faking good," which means that "he was trying to make believe or convince me that there is nothing wrong with him psychologically."

When asked for her opinion on the defendant's mental status on the night of December 9, 1993, Grenier stated: "I believe that at that time when this occurred, this incident occurred, that [the defendant] was really suffering from a delusional disorder that prevented him from understanding that his thinking was not normal in the sense we would expect it to be, that he was not rationally looking at the situation and that he was not

weighing the factors in a rational way and that, there-fore, he didn't know that his behavior was not in keeping with what was expected by the law and society. And also, that because of the fact that he felt himself in some way, because of his delusions, to be in danger of some type, in that this person was not the person he thought her to be, that he felt himself to be in danger as well. And I think that the degree of anxiety that very likely caused led him to not be able to control his behavior and say I need to stop and think this through, I can't do this, for example. That he was just not able to do that, to stop and think and control his behavior."

The defendant testified that "[a]t the moment before I fired the gun, I believed, fairly convinced she was going to shoot me with the gun if she could. And I really believed through the relationship for the past four or five months she was just trying to aggravate me on purpose, trying to cause a problem like this."

Two state troopers testified for the state. Trooper David Bland testified that while he was guarding the defendant at the crime scene, the defendant stated that he shot the victim in self-defense. Specifically, Bland testified that the defendant made the following state-ments: "What would you do if someone came on you? What if he threatened you and you came to him? It would be self-defense. . . . She swung the shotgun at me, self-protection. She swung it. . . . In my house I had to protect myself. It was me or her. So I got the gun." Trooper John Covello testified that while trans-porting the defendant to the police barracks, the defen-dant stated that the victim had threatened to harm him and to get the shotgun and kill him and, at the police barracks, the defendant stated that the victim was not the woman he was going to marry and that she was going to kill him and was trying to take control of his life.

On the basis of this testimony, I conclude that the defendant presented sufficient evidence "from which

a jury reasonably could have found, by a preponderance of the evidence, that, due to a mental disease or defect, the defendant misperceived reality and, in acting on the basis of that misperception, did not substantially appreciate that his actions were contrary to societal morality." Id., 627. As our Supreme Court stated in *Wilson*, the test that is adopted "requires a fact finder to look beyond the defendant's appreciation of society's objective disapproval of his actions and to inquire whether the defendant, as a result of mental disease or defect, truly believed that society, if it were aware of the circumstances as he honestly perceived them, would have condoned his actions." Id., 627–28.

In a footnote, the *Wilson* court enunciated what a defendant must establish to prevail. "[T]he defendant, under the definition of 'wrongfulness' that the jury will receive on retrial, may prevail if he can establish that, due to his mental disease or defect, he substantially misperceived reality and harbored a delusional belief that society, under the circumstances as he honestly but mistakenly understood them, would not morally have condemned his actions. Consequently, it will be for the jury to determine whether the defendant, as a result of his mental illness, believed that society would not have morally condemned his conduct in light of the facts as *he* perceived them." (Emphasis in original.) Id., 627 n.24.

It was the defendant's theory that at the time of the shooting he was suffering from a mental illness, the effect of which was the defendant's belief that the victim, the evil double, was going to kill him, which resulted in the defendant's defending himself and shooting the victim in self-defense. Although other evidence existed that tended to show that the defendant might not have acted in self-defense under the influence of a mental illness, that goes to the weight of the defendant's proof, and not to whether the defendant was entitled

to a jury instruction correctly defining the term "wrong-fulness." Id., 628; see *State* v. *Person*, supra, 236 Conn. 353; see also *State* v. *DeJesus*, 236 Conn. 189, 201, 672 A.2d 488 (1996); *State* v. *Sivri*, 231 Conn. 115, 132–33, 646 A.2d 169 (1994).

I also believe that the defendant has satisfied his burden of persuasion that the trial court's failure to deliver the requested charge constituted harmful error. As our Supreme Court held in *Wilson*: "Because the meaning of wrongfulness under [General Statutes] § 53a-13 (a) was left unclear and because that lack of clarity affected a central element of the defendant's claim of insanity, we conclude that the trial court's failure to define 'wrongfulness' in terms of the defendant's appreciation of societal morality constituted harmful error." *State* v. *Wilson*, supra, 242 Conn. 633.

I conclude that the defendant produced sufficient evidence from which a jury reasonably could have concluded that due to his mental illness, he misperceived reality in that he believed the victim was about to kill him and, on the basis of this misperception, he did not substantially appreciate that his action in self-defense was contrary to social morality. Thus, it would have been proper to instruct the jury on the requested charge. Again, it is ultimately the responsibility of the trier of fact to determine "whether the defendant, as a result of his mental illness, believed that society would not have morally condemned his conduct in light of the facts as he perceived them"; id., 627 n.24; and, in this case, there was sufficient evidence to allow the jury to make that determination.

I would reverse the judgment of the trial court and remand this case for a new trial.