STATE OF CONNECTICUT v. NATHAN DULL
(AC 20357)

Spear, Hennessy and Daly, Js.

Argued June 5—officially released August 29, 2000

*Conrad Ost Seifert*, for the appellant (defendant).

*Lawrence J. Tytla*, senior assistant state's attorney, with whom, on the brief, was *Kevin T. Kane*, state's attorney, for the appellee (state).

*Opinion*

DALY, J. The defendant, Nathan Dull, appeals from the judgment of conviction, rendered after a trial by a three judge panel,[1] of murder in violation of General

---

[1] The three judges were impaneled pursuant to General Statutes § 54-82, which provides in relevant part: "(a) In any criminal case, prosecution or proceeding, the party accused may, if he so elects when called upon to plead, be tried by the court instead of by the jury; and, in such case, the court shall have jurisdiction to hear and try such case and render judgment and sentence thereon.

"(b) If the accused is charged with a crime punishable by death or imprisonment for life and elects to be tried by the court, the court shall be composed of three judges to be designated by the Chief Court Administrator, or his designee, who shall name one such judge to preside over the trial. Such judges, or a majority of them, shall have power to decide all questions of law and fact arising upon the trial and render judgment accordingly. . . ."

Statutes § 53a-54a.[2] On appeal, the defendant claims that the trial court improperly (1) concluded that he failed to establish as an affirmative defense that he lacked substantial capacity due to a mental disease or defect to appreciate or control his wrongful conduct,[3] (2) violated his due process rights by failing to require the state to disprove his insanity defense[4] beyond a reasonable doubt and (3) denied his motion for a pre-sentence psychiatric evaluation pursuant to General Statutes § 17a-566.[5] We affirm the judgment of the trial court.

[2] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . by force, duress or deception . . . ."

[3] General Statutes § 53a-13 (a) provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

[4] General Statutes § 53a-13 sets forth the parameters of the defense, but does not mention the term "insanity." Rather, it refers to a defendant's "mental disease or defect." Throughout this opinion, we use the terms "insanity" and "mental disease or defect" interchangeably.

[5] General Statutes § 17a-566 (a) provides in relevant part: "Except as provided in section 17a-574 any court prior to sentencing a person convicted of an offense for which the penalty may be imprisonment in the Connecticut Correctional Institution at Somers . . . may if it appears to the court that such person has psychiatric disabilities and is dangerous to himself or others, upon its own motion or upon request of any of the persons enumerated in subsection (b) of this section and a subsequent finding that such request is justified, order the commissioner to conduct an examination of the convicted defendant by qualified personnel of the division. Upon completion of such examination the examiner shall report in writing to the court. Such report shall indicate whether the convicted defendant should be committed to the diagnostic unit of the division for additional examination or should be sentenced in accordance with the conviction. Such examination shall be conducted and the report made to the court not later than fifteen days after the order for the examination. Such examination may be conducted at a correctional facility if the defendant is confined or it may be conducted on an outpatient basis at the division or other appropriate location. If the report recommends additional examination at the diagnostic unit, the court may, after a hearing, order the convicted defendant committed to the diagnostic unit of the division for a period not to exceed sixty days, except as provided

The court reasonably could have found the following facts. The defendant had a long history of mental instability and substance abuse prior to the victim's murder. In the summer of 1990, the defendant enlisted in the United States Marine Corps and began basic training at Parris Island. Thereafter, he was sent to Okinawa, where he experienced psychological and behavioral problems that resulted in his hospitalization at Bethesda Naval Hospital and treatment with antipsychotic medications. In the fall of 1992, he was discharged from the Marines and classified as being 50 percent mentally disabled from paranoid schizophrenia, which entitled him to receive disability benefits. Thereafter, the defendant's condition had worsened and he was reclassified as being 100 percent mentally disabled as of September, 1995.

In the fall of 1996, the defendant moved to Groton. The victim and his friend, Richard Vanenburg, were crack cocaine dealers from Brooklyn and occasionally stayed at the defendant's home. The defendant sometimes purchased cocaine from the victim and Vanenburg with his monthly disability check or obtained the drug in exchange for allowing them to use his apartment.

At approximately 8 a.m. on January 20, 1997, Vanenburg went to the defendant's apartment for a prearranged meeting, but the defendant's car was not in the parking lot. Vanenburg returned at 9 a.m. with a key to unlock the door. He entered the apartment where

in section 17a-567 provided the hearing may be waived by the defendant. Such commitment shall not be effective until the director certifies to the court that space is available at the diagnostic unit. While confined in said diagnostic unit, the defendant shall be given a complete physical and psychiatric examination by the staff of the unit and may receive medication and treatment without his consent. The director shall have authority to procure all court records, institutional records and probation or other reports which provide information about the defendant."

he discovered the victim's body on the bathroom floor. The evidence suggested that the victim died from multiple blows to the head and face by a baseball bat.

The defendant was located several hours later in Rhode Island, where he was interviewed by a detective. Although he admitted to using marijuana and crack cocaine on the day of the murder, he did not admit to killing the victim. Forensic evidence linked the defendant to the killing, however, and, subsequently, he was charged with murder.

The defendant elected to be tried by a three judge panel.[6] At trial, he offered the affirmative defense that he suffered from paranoid schizophrenia, that he was in an acutely psychotic state at the time of the killing and that he lacked substantial capacity to appreciate or control his wrongful conduct. On September 14, 1998, the court rejected the defendant's insanity defense and found him guilty of murder. The court noted that there was a divergence of opinion concerning the defendant's mental capacity among the various mental health professionals who had evaluated him and concluded that the defendant failed to establish his affirmative defense by a preponderance of the evidence.

On January 20, 1999, defense counsel moved for a court-ordered psychiatric evaluation of the defendant to assist in the sentencing. The motion was denied. The defendant reargued the motion, but it was denied a second time. The defendant's motion for a judgment of acquittal also was denied. On April 16, 1999, the defendant was sentenced to a term of thirty-five years to serve.[7] This appeal followed.

---

[6] The panel consisted of Judges Thomas P. Miano, Thomas F. Parker and Stuart M. Schimelman, with Judge Miano presiding.

[7] The thirty-five year sentence that was imposed was five years longer than the sentence that had been requested by the state, and Judge Schimelman dissented because he thought that an appropriate sentence would have been a sentence of forty-five years to serve.

I

The defendant first claims that the court improperly concluded that he failed to establish lack of substantial capacity as an affirmative defense. The defendant specifically claims that the court did not make the threshold finding that he suffered from mental illness and thus never considered whether he lacked substantial capacity to appreciate that his conduct was wrongful or to control his conduct within the requirements of the law. We do not agree.

We initially note that the defendant misconstrues the trial court's ruling, which expressly states that the defendant failed to prove his affirmative defense that "he lacked substantial capacity *as a result of mental disease or defect.*" (Emphasis added.) The issue before this court, therefore, is whether the trial court's conclusion that the defendant had failed to prove that he lacked substantial capacity as a result of mental disease or defect is supported by the evidence.

The following additional facts are relevant to our resolution of this issue. In support of his affirmative defense that he suffered from a mental disease or defect, the defendant presented testimony from family members and a minister who had known him for many years. The defendant's mother testified that following his discharge from the Marines, the defendant had "a whole different persona about him." She observed that the defendant had become sullen and withdrawn, that he laughed inappropriately and that he paced back and forth on the deck of their home, claiming to be guarding it. She also testified that the defendant characterized himself as "insane for the Lord," and that he spoke about going to Israel to join the Mossad security force. She described how the defendant lost his job at a local hospital when he discontinued his medication and how his lifestyle deteriorated in 1995 and 1996.

The defendant's father offered similar testimony as to the defendant's behavioral changes and his erratic compliance with his prescribed medications. The family minister further testified that when he had met with the defendant after his military discharge, the defendant did not make eye contact, appeared anxious and was a markedly different person than the one he had known before he joined the Marines.

Two experts provided additional testimony for the defense. Susan Kruger, a psychiatrist at the Veterans Hospital in West Haven, where the defendant had been diagnosed as a paranoid schizophrenic some years earlier, treated the defendant from 1992 to 1996 and met with him a day or two after the murder. She testified that after being diagnosed with schizophrenia, the defendant initially did well on his antipsychotic medication, but that his condition deteriorated when he neglected to take the medication. During those times, Kruger observed various symptoms of mental illness, including hallucinations, disorganized behavior and disorganized thinking. She, therefore, changed the defendant's medication to a type that could be administered by monthly injections and noted that the defendant had failed to go to the hospital for his monthly injection in January, 1997. She stated that when she met with the defendant one day after the victim's death, he appeared anxious, expressed concern about being a suspect and denied killing the victim or being in the apartment when the victim was killed. She also recalled, however, that the defendant did not seem to experience any auditory hallucinations during their interview.

Peter Zeman, a psychiatrist who examined the defendant after the murder, testified at trial and also produced a written report on the defendant's condition that was entered into evidence. In preparing his report, Zeman interviewed the defendant four times, reviewed the defendant's past medical records and relied on por-

tions of a comprehensive psychological evaluation conducted by his colleague Frank Stoll, who was a psychologist.[8] Zeman testified that during three of the four interviews the defendant was medicated, that he admitted to the killing and that he appeared to be nonpsychotic. He also testified that during one interview when the defendant was not medicated he denied killing the victim and appeared to be "floridly psychotic."

According to Zeman, the defendant said that he had gone to Brooklyn to visit the victim's family and to obtain drugs the weekend before the killing. The defendant also told Zeman that the victim had given him crack cocaine during the weekend, which he smoked, that he had stopped taking his medication at least two weeks before the killing and that he subsequently began hearing voices telling him to kill the victim. The defendant confessed that he picked up the baseball bat and repeatedly struck the victim on the head in response to the voices and then dragged the victim to the bathroom, undressed him, searched him for drugs and smoked the drugs he had found before leaving for Rhode Island.

Zeman opined that the defendant was intoxicated from cocaine at the time of the killing but that, even if he had not been intoxicated, his schizophrenic illness was so severe that he would have lacked substantial capacity either to appreciate that his conduct was wrongful or to control his conduct within the requirements of the law. Zeman attributed the defendant's having missed his monthly injection of medication in January as the cause of his psychotic decompensation at the time of the victim's death.

In rebuttal to the defendant's insanity defense, the state primarily relied on its cross-examination of the two defense psychiatrists and Stoll's psychological eval-

---

[8] Zeman requested that Stoll conduct the evaluation, but ultimately disagreed with Stoll's conclusion that the defendant was not psychotic.

uation.[9] Stoll's report was based on three interviews
with the defendant while the defendant was medicated
and a review of the defendant's past medical records.
Stoll observed that although the mental health profes-
sionals who had examined and treated the defendant
in the past all found mental health problems, all did not
conclude that he suffered from paranoid schizophrenia.
Prior to the defendant's discharge from the Marines,
for example, the defendant was diagnosed at different
times as suffering from alcohol abuse and avoidant
personality traits or from a personality or conversion
disorder, with no evidence of psychotic illness. Stoll's
report also noted that after his arrest, the defendant was
examined and treated at the Whiting Forensic Institute
(institute). Although the defendant was diagnosed with
schizophrenia when admitted to the institute, the treat-
ing psychiatrist eventually decided that he did not suffer
from a psychotic disorder and ultimately decreased and
discontinued his medication with no obvious changes
in the defendant's behavior or mental status. In fact,
the discharge summary from the institute indicated that
the defendant's condition at the time of discharge was
normal, that there was no evidence of disorganization,
delusions or other psychotic processes and that the
defendant was not experiencing hallucinations. The
defendant's diagnosis upon discharge from the institute
was that of cocaine dependence and adjustment disor-
der with anxiety.

Stoll believed that his own testing of the defendant
also failed to support a diagnosis of schizophrenia. He
concluded instead that the defendant was cocaine
dependent and had a severe personality disorder with
schizoid and antisocial features. During Stoll's examina-
tion, the defendant refused to complete at least one test
because it would not help him prove he was psychotic at

---

[9] Stoll's written evaluation was entered into evidence in conjunction with
Zeman's report, but Stoll himself did not testify at trial.

the time of the murder. Stoll thus suggested that the defendant might have been feigning psychosis after the murder, although he found it difficult to believe that the defendant was bright or sophisticated enough to mislead so many competent psychiatrists and other mental health professionals. Stoll finally noted that the defendant had admitted to being high on crack when he attacked the victim and had given vague and contradictory answers as to whether the murder might have resulted from auditory hallucinations to kill, a desire to obtain crack or some combination of the two.

The state also attempted to undermine Zeman's testimony for the defense. On cross-examination, Zeman admitted that despite the defendant's prior history of hallucinations, he was unaware of any instance other than on the day of the killing that the defendant reported having command hallucinations. He stated that common symptoms of a person in a psychotic state would persist over a period of time, unless alleviated by medication, would be noticeable to a lay person and would include a disheveled and dirty appearance, talking in nonsensical ways, looking around as though responding to voices, mumbling and an inability to hold a train of thought, complete a sentence or respond appropriately to inquiries, none of which symptoms the defendant displayed after the killing.

The state also elicited testimony from a friend of the defendant who lived in Rhode Island that the defendant had showered, shaved and changed his clothes when he arrived at the friend's apartment after the killing, thereby evincing attention to his appearance. Moreover, a detective from Rhode Island testified that during nearly five hours of questioning the defendant was calm, articulate and responsive, and that he did not display any symptoms indicating psychosis. Zeman testified that he was unaware that the defendant had made a brief, coherent and unremarkable telephone call to his

friend in Rhode Island on the morning of the killing. At one point, Zeman even acknowledged that the only possible indication that the defendant was psychotic was his denial to the detective that he was psychotic. Zeman also acknowledged that the use of crack cocaine could cause violent and aggressive behavior and induce psychotic symptoms, and he admitted that there was no way to quantify the aspects of the defendant's behavior that could be attributed to an underlying psychosis and those that could be attributed to simultaneous cocaine intoxication.

"It is apparent, therefore, that the [court] reviewed conflicting evidence on the issue of the defendant's mental capacity at the time he [committed the proscribed acts]. The evaluation of such conflicting evidence on the issue of legal insanity is the province of the finder of fact. . . . [W]e have repeatedly stated that our review of the conclusions of the trier of fact . . . is limited. . . . This court will construe the evidence in the light most favorable to sustaining the trial court's [judgment] and will affirm the conclusion of the trier of fact if it is reasonably supported by the evidence and the logical inferences drawn therefrom. . . . The probative force of direct and circumstantial evidence is the same. . . . The credibility of expert witnesses and the weight to be given to their testimony and to that of lay witnesses on the issue of sanity is determined by the trier of fact. . . . Furthermore, [i]n its consideration of the testimony of an expert witness, the [trier of fact] might weigh, as it sees fit, the expert's expertise, his opportunity to observe the defendant and to form an opinion, and his thoroughness. It might consider also the reasonableness of his judgments about the underlying facts and of the conclusions which he drew from them. . . . Moreover, [a]lthough expert witnesses testified on behalf of the defendant and the state called none, that alone is not a sufficient basis to disturb

the verdict on appeal . . . for the [trier of fact] can disbelieve any or all of the evidence on insanity and can construe that evidence in a manner different from the parties' assertions. . . . It is the trier of fact's function to consider, sift and weigh all the evidence including a determination as to whether any opinions given concerning the defendant's sanity were undercut or attenuated under all the circumstances. *State* v. *Evans*, 203 Conn. 212, 242, 523 A.2d 1306 (1987); see also *State* v. *Cobb*, 251 Conn. 285, 490, 743 A.2d 1 (1999) (the state can weaken the force of the defendant's presentation by cross-examination and by pointing to inconsistencies in the evidence . . .)." (Citations omitted; internal quotation marks omitted.) *State* v. *Quinet*, 253 Conn. 392, 407–408, 752 A.2d 490 (2000).

In light of the totality of evidence, the court reasonably could have rejected the opinions of Kruger and Zeman and relied on the report of Stoll and the testimony of the other witnesses in concluding that the defendant had failed to prove by a preponderance of the evidence that, due to a mental disease or defect, he lacked substantial capacity to appreciate or control his wrongful conduct. "[T]he state mounted a vigorous challenge to the defendant's insanity defense, and adduced considerable evidence, both on cross-examination and in its rebuttal case, to undermine the defendant's claim." Id., 411. Accordingly, we reject the defendant's assertion that the evidence presented in support of his defense was so persuasive as to require a finding that it was more likely than not that he lacked substantial capacity due to a mental disease or defect to appreciate or control his wrongful conduct. The defendant, therefore, cannot prevail on his claim.

II

The defendant next claims that the court violated his due process rights, as protected by the United States

constitution and article first, §§ 8 and 9, of the Connecticut constitution,[10] in failing to require the state to disprove insanity. The defendant concedes that General Statutes § 53a-13 (a) imposes the burden of proving mental disease on a defendant and that current Connecticut Supreme Court precedent deems the statute constitutional, but nevertheless reasserts the same constitutional argument that failed in *State* v. *DeJesus*, 236 Conn. 189, 205, 672 A.2d 488 (1996), *State* v. *Joyner*, 225 Conn. 450, 471–72, 625 A.2d 791 (1993), and *State* v. *Cole*, 50 Conn. App. 312, 319–20, 718 A.2d 457 (1998), aff'd, 254 Conn. 88, 755 A.2d 202 (2000), in the hope that the holdings in these cases will be overruled.

In *State* v. *Joyner*, supra, 225 Conn. 458, our Supreme Court acknowledged the federal principle that a defendant's sanity is not an element of the state's case, so that the state need not bear the burden of proof on that issue. The court then concluded that the Connecticut constitution permits the legislature to determine that the defendant, rather than the state, must shoulder the burden of proof on sanity when sanity is not an element in the charge against the defendant. Id., 472; see also *State* v. *DeJesus*, supra, 236 Conn. 205. This court is bound by the decisional law of our Supreme Court. *State* v. *Cole*, supra, 50 Conn. App. 320. Accordingly, we conclude that the defendant's due process rights were not violated.

## III

The defendant finally claims that the court abused its discretion in failing to grant his motion for a presen-

---

[10] Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

Article first, § 9, of the constitution of Connecticut provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

tence psychiatric examination pursuant to § 17-566.[11] The defendant contends that such an examination would have shown that he is mentally ill, thereby justifying a substantial mitigation of his sentence. We do not agree.

It is within the discretion of the trial court to grant or deny a motion made pursuant to § 17a-566. *State* v. *Maldonado*, 51 Conn. App. 702, 706, 725 A.2d 962, cert. denied, 249 Conn. 904, 733 A.2d 224 (1999). "The purpose of an examination under [§ 17a-566] is not to determine competency to be sentenced. . . . The purpose of an examination under [§ 17a-566] is to allow the commissioner of mental health to make recommendations as to certain offenders concerning the sentence to be imposed and the place of confinement. . . . Nevertheless, [w]here the court has adequate psychiatric documentation of the defendant's mental condition, there is no need for it to utilize the statutory provisions concerning further examinations. . . . The presence of some degree of mental illness does not prevent or avoid the imposition of sentence by the court nor does it necessarily require that the court blindly and automatically implement the statutory machinery providing for psychiatric examinations." (Citation omitted; internal quotation marks omitted.) Id., 706–707.

In the present case, the court had more than sufficient evidence regarding the defendant's mental condition to make an informed sentencing decision. The court reviewed the records of the Department of Veterans Affairs regarding the defendant's psychiatric diagnosis. It also heard testimony from two psychiatrists in support of the defendant's affirmative defense that due to his mental illness he lacked substantial capacity to appreciate or control his conduct within the requirements of the law. Stoll's psychological evaluation of the defendant also was entered into evidence, as were

[11] See footnote 5.

records from the institute where the defendant was treated while awaiting trial. These combined sources provided extensive information as to the defendant's treatment and diagnostic history, including his prior hospitalizations. Furthermore, the court noted in its sentencing decision that it had "taken into consideration and reviewed with great care [the defendant's] mental health history." Under these circumstances, the court did not abuse its discretion in denying the defendant's motion pursuant to § 17a-566.

The judgment is affirmed.

In this opinion the other judges concurred.