## STATE OF CONNECTICUT *v.* DONALD COLE
### (SC 16039)

McDonald, C. J., and Palmer, Sullivan, Callahan and Vertefeuille, Js.*

(*One justice concurring separately in the result*)

Argued December 9, 1999—officially released August 8, 2000

* Although Justice Callahan reached the mandatory age of retirement before August 8, 2000, the date that this opinion is officially released, his continued participation on this panel is authorized by Public Acts 2000, No. 00-191, § 11.

*Neal Cone*, assistant public defender, for the appellant (defendant).

*Mitchell S. Brody*, assistant state's attorney, with whom, on the brief, was *John A. Connelly*, state's attorney, for the appellee (state).

*Opinion*

PALMER, J. Following a jury trial, the defendant, Donald Cole, was convicted of murder in violation of General Statutes § 53a-54a.[1] The trial court rendered judgment in accordance with the jury verdict,[2] and the

[1] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a) of this section, on the question of whether the defendant acted with the intent to cause the death of another person. . . ."

[2] The trial court sentenced the defendant to a term of sixty years imprisonment.

defendant appealed to this court. We transferred the appeal to the Appellate Court pursuant to General Statutes § 51-199 (c) and what is now Practice Book § 65-1, and the Appellate Court affirmed the trial court's judgment of conviction. *State* v. *Cole,* 50 Conn. App. 312, 332, 718 A.2d 457 (1998). We granted the defendant's petition for certification limited to the following issue: "Was the Appellate Court correct in concluding that the trial court's failure to define the term 'wrongfulness' [for purposes of the affirmative defense[3] of insanity[4]] under General Statutes § 53a-13 (a)[5] was not improper?" *State* v. *Cole,* 247 Conn. 937, 722 A.2d 1217 (1998). We conclude that, under the facts of this case, the trial court's failure to define the term "wrongfulness" for

[3] As with other affirmative defenses, the defendant bears the burden of proving lack of capacity due to mental disease or defect under General Statutes § 53a-13 (a) by a preponderance of the evidence. General Statutes § 53a-12.

[4] General Statutes § 53a-13, which sets forth the parameters of the insanity defense, does not use the term "insanity," but, rather, refers to a defendant's "mental disease or defect." For convenience, we use the terms "insanity" and "mental disease or defect" interchangeably throughout this opinion. No distinction between those two terms is intended.

[5] General Statutes § 53a-13 provides: "Lack of capacity due to mental disease or defect as affirmative defense. (a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law.

"(b) It shall not be a defense under this section if such mental disease or defect was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor or any drug or substance, or any combination thereof, unless such drug was prescribed for the defendant by a prescribing practitioner, as defined in subdivision (22) of section 20-571, and was used in accordance with the directions of such prescription.

"(c) As used in this section, the terms mental disease or defect do not include (1) an abnormality manifested only by repeated criminal or otherwise antisocial conduct or (2) pathological or compulsive gambling."

The legislature made a technical amendment to subsection (b) of § 53a-13 in 1995; see Public Acts 1995, No. 95-264, § 64; that is not relevant to this appeal. For convenience, we refer to the current revision of § 53a-13 throughout this opinion.

purposes of § 53a-13 (a) was not improper. Accordingly, we affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following facts that the jury reasonably could have found. "On December 9, 1993, at approximately 8 p.m., the defendant telephoned Susan Hellwinkle at her home in Woodbury. The defendant told Hellwinkle that he had shot his girlfriend twice and that she was dead. After hanging up with the defendant, Hellwinkle immediately telephoned the police to report the defendant's statements. Shortly thereafter, state police [officers] from Troop L in Litchfield were dispatched to the defendant's residence in Woodbury. Upon arriving at the defendant's residence, the officers took up positions surrounding the house. William Longo, a sergeant with the state police, telephoned the defendant from outside of the house and instructed the defendant to come out of the front door with his hands empty and in plain view. The defendant opened the front door and stepped onto the front porch. After the defendant stepped onto the front porch, Pete Warren, a lieutenant with the state police, gave the defendant further instructions as to how to surrender. The defendant followed Warren's instructions and was handcuffed by Officer David Bland.

"After turning over the defendant to other officers, Longo and Bland entered the house through the front door and proceeded to a master bedroom at the end of a hallway. Upon entering the bedroom, the officers discovered the victim on the floor at the foot of the bed. The victim was fully clothed, lying on her back. The top half of the victim's torso was wrapped in a blanket that was folded across her face. There were numerous tears in the upper part of the victim's blouse and a wound to the victim's face. The plastic casing from a discharged shotgun shell was entwined in the victim's hair. There was a small amount of blood splat-

tered on the wall across from the victim. There were also bloody drag marks from the wall to the foot of the bed. In one of the bedroom walls, behind an undamaged poster, were three bullet holes surrounded by splattered blood and hair. A discharged shotgun shell was found under bloodstained clothes in a laundry basket. Another discharged shotgun shell was found at the foot of the bed. There was a pool of blood on the bedroom floor beneath a red flannel shirt. A twelve-gauge shotgun was found in the closet of a second bedroom. Forensic testing revealed that the discharged shotgun shells found in the master bedroom had been ejected from this shotgun.

"Ira Kanfer, a forensic pathologist with the state medical examiner's office, conducted an autopsy of the victim. Kanfer's examination revealed a gunshot wound to the victim's chest with the bullet traveling upward and lodging in the victim's brain. Kanfer's examination also revealed a second gunshot wound to the victim's neck with the bullet traveling downward and exiting through her back. Kanfer stated that the gunshot to the neck occurred first and that the second shot occurred while the victim was on the floor. Kanfer attributed the victim's death to multiple gunshot wounds.

"While the police were searching the defendant's residence, the defendant was brought inside and calmly stated: 'It was self-protection. She was yelling at me.' The defendant also stated that the victim had swung the shotgun at him and that he had to protect himself. In addition, the defendant stated: 'I'm not going to let anyone come in and push me around. I have my gun.' Later, while the police were transporting the defendant to the state police barracks in Litchfield, he stated that the victim was fighting him like a man, had threatened to kick him in the groin and was going to get the shotgun and kill him. After arriving at the barracks, the defendant stated that the victim was going to kill him and

was trying to take over his life. The defendant also stated that the victim had told him that he was unfit to raise his children and that he had been aggravated into killing her.

"The defendant testified as follows. Approximately one month prior to the incident, the victim, who had been living with the defendant, moved out of the defendant's home and was living in New Milford. On December 9, 1993, at approximately 4 p.m., the victim telephoned the defendant and asked if she could come over for dinner. The defendant agreed to have the victim over for dinner with him and his three children. The victim arrived after the defendant and his children had finished eating and ate alone in the kitchen while the defendant watched his children playing in the basement. After approximately fifteen minutes, the victim angrily called downstairs to the defendant: 'Get your ass up here or I'm going to kill you.' The defendant went upstairs to the master bedroom and the victim asked him why she had to work for a living and pay her own rent. The defendant responded that it was not his responsibility to take care of her. The defendant told the victim that it was best for her to move out, that they were stuck in a rut and that she should go home. The victim became upset with the defendant and began slapping and kicking him. The defendant told her to stop and to get out of the house. The victim said that she knew the defendant had a loaded shotgun in the bedroom closet and that she was going to shoot him with it. The defendant removed the shotgun from the closet and told the victim that she was not going to get any guns and that she should get out of the house. The victim again slapped and kicked the defendant. The defendant backed up approximately five feet and pointed the shotgun at the victim. The defendant turned off the safety mechanism and fired two shots at the victim. The first shot was fired when the victim was

standing and the second as the victim fell. The defendant stated that he did not intend to kill the victim and characterized his conduct as a subconscious reaction. Although the defendant acknowledged that the victim never touched the shotgun, he said that he was trying to protect himself because he was convinced that the victim would shoot him if she could get her hands on the gun.[6] The defendant also said, however, that he had not shot the victim in self-defense and that he was incorrect in previously having thought that he had. In addition, the defendant stated that he did not know what made him shoot the victim." *State* v. *Cole*, supra, 50 Conn. App. 314–17.

At trial, the defendant claimed that he did not have the specific intent to kill the victim and, in addition, raised the affirmative defense of insanity under § 53a-13 (a).[7] In support of his affirmative defense, the defendant adduced the testimony of two experts, Walter Borden, a psychiatrist, and Julia Ramos-Grenier, a clinical psychologist. Borden testified that, on December 9, 1993, and for several years prior thereto, the defendant suf-

---

[6] In particular, the defendant testified: "[The victim] told me she had known I had a loaded gun, a shotgun. She was going to shoot me. A loaded shotgun in the closet behind me, and she would shoot me with it." The defendant further testified: "At the moment before I fired the gun, I believed—[I was] fairly convinced she was going to shoot me with the gun if she could. And I really believed through the relationship for the past four or five months she was just trying to aggravate me on purpose, trying to cause a problem like this."

[7] The defendant did not claim self-defense under General Statutes § 53a-19 (a) and, consequently, he did not seek an instruction under that statutory subsection. General Statutes § 53a-19 (a) provides in relevant part: "[A] person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm."

fered from chronic paranoid schizophrenia.[8] Borden indicated that the defendant's mental illness first manifested itself in the mid-1980s and, thereafter, progressively became more severe. According to Borden, the defendant's mental illness was characterized by hallucinations and delusions of persecution involving people conspiring to harm and even kill him. The defendant believed that he heard the voices of these and other persons speaking to or about him in highly insulting and derogatory terms. Borden further testified that, as a result of the defendant's mental illness, the defendant came to believe that the victim had an evil or bad "double" who, from time to time, would take the victim's place. Borden opined that, on the day of the shooting, the defendant, as a result of his paranoid and delusional ideation, believed that the victim had threatened to kill him and that she intended to do so. Borden testified that the defendant was extremely afraid of the victim and that he had shot her because he was convinced that she would kill him if he did not stop her.[9]

[8] Borden based his opinion on his interviews and examination of the defendant on three separate occasions between May and July, 1994, the results of certain psychological tests that he and Ramos-Grenier had administered to the defendant, his interview of the defendant's parents, his review of certain statements that had been made by acquaintances of the defendant and his analysis of the relevant investigative reports.

[9] In explaining how the defendant's "mental disease or defect . . . affected [the defendant's] understanding of the events as they took place on December 9, 1993," Borden testified: "I think [that his mental illness] affected [his understanding] profoundly in the sense that he believed . . . [the victim] was going to harm, kill him. . . . He believes he heard her telling him that that's what she was going to do. And he believed that she was going to do that. Now, in my opinion, that's what he believes. My opinion [is that] he was delusional and hallucinating [and] that he believed she was going to. He believed that before, too, at times. So he heard her. That doesn't mean she said that. That's what he believed, that he heard her threaten him and that he believed she was going to do it and that was his understanding of what was going on. So, I think his understanding was very strongly colored, influenced based on his paranoia, his paranoid delusions and hallucinations." Borden further testified that the defendant's "mental state, paranoia, resulted in extreme fear, fear for his life and that fear directly influenced his behavior."

Ramos-Grenier testified that the defendant suffered from a psychosis that occasionally caused him to lose touch with reality, especially when he was under stress.[10] In particular, Ramos-Grenier indicated that the defendant believed that the victim was not his girlfriend, but, rather, an evil double who had been sent to replace her. Ramos-Grenier stated that, on the day of the shooting, the defendant "was . . . suffering from a delusional disorder that prevented him from understanding that his thinking was not normal in the sense we would expect it to be, that he was not rationally looking at the situation and that he was not weighing the factors in a rational way and that, therefore, he didn't know that his behavior was not in keeping with what was expected by the law and society." Ramos-Grenier further testified that, "because of the fact that [the defendant] felt himself in some way, because of his delusions, to be in danger of some type, in that this person [the victim] was not the person he thought her to be,[11] that he felt himself to be in danger as well. And I think that the degree of anxiety . . . very likely caused . . . him to not be able to control his behavior and say I need to stop and think this through, I can't do this . . . that he just was not able to . . . stop and think and control his behavior."[12]

---

[10] Ramos-Grenier also had interviewed and examined the defendant on three occasions, reviewed a battery of psychological tests that she had administered to him, interviewed his parents and reviewed various records.

[11] For example, the defendant, during his trial testimony, identified a newspaper clipping, dated November 17, 1995, containing an advertisement for a dating service that he claimed could establish that the person he had killed was not his former girlfriend but, rather, her evil double. Specifically, the defendant testified that he had sent the advertisement to defense counsel soon after reading it because he believed that one of the photographs contained therein demonstrated that the victim "was still alive and that it could prove there were two women who looked similar and they were actually doubles and that I was spending time with either one and wasn't told that there were two. They were switching back and forth."

[12] Both Ramos-Grenier and Borden testified that the defendant also suffered from alcoholism and drug abuse.

Finally, two state police officers testified regarding statements that the defendant had made to them shortly after the shooting.[13] Officer Bland testified that, while he was guarding the defendant at the crime scene, the defendant stated: "What would you do if someone came on to you? What if he threatened you and you came to him? It would be self-defense. . . . She swung the shotgun at me: self-protection. She swung it. . . . In my house, I had to protect myself. It was me or her. So I got the gun." Officer John Covello testified that, while he was transporting the defendant to the state police barracks, the defendant told him that the victim had threatened to get the shotgun and kill him. Covello further testified that when they reached the barracks, the defendant stated that the victim was not the woman he was going to marry, that she was trying to take control of his life and that she was going to kill him.[14]

The defendant submitted a request to charge the jury that "[a defendant] is not criminally responsible for his offending act if, because of mental disease or defect, he believes that he is morally justified in his conduct— even though he may appreciate that his act is criminal. A defendant lacks substantial capacity to appreciate the wrongfulness of his conduct if he knows his act to be criminal but commits it because of a delusion that [he is acting in] self-defense and [is] therefore justified." The trial court declined to give the requested jury charge and, instead, instructed the jury that "it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity . . . as a result of mental disease or defect either to appreciate the wrongfulness of his conduct or control his conduct within the requirements of the law."

---

[13] The two state police officers testified in the state's case-in-chief.

[14] The defendant also presented testimony from a number of acquaintances who testified about the defendant's bizarre and paranoid behavior in the days and months leading up to the shooting.

The trial court further explained that a defendant lacks substantial capacity to appreciate the wrongfulness of his conduct if he "lack[s] substantial capacity to understand both intellectually and emotionally that his actions were wrong. This does not include a person whose faculties were impaired in some measure, but were still sound enough for him to understand that his conduct was wrong. Not every mental deficiency or abnormality leaves a person without substantial capacity to appreciate the wrongfulness of his conduct. It's only when he lacks substantial capacity to appreciate that a particular act or course of conduct was wrong that this part of the affirmative defense excuses him from criminal liability."

On appeal to the Appellate Court, the defendant claimed, inter alia, that the trial court improperly refused to define the term "wrongfulness" for purposes of the affirmative defense of insanity under § 53a-13 (a).[15] The defendant based his claim on our decision in *State* v. *Wilson*, 242 Conn. 605, 700 A.2d 633 (1997),[16] in which we concluded that the cognitive prong of the insanity defense[17] embraces principles of societal morality and, therefore, "a defendant does not truly 'appreciate the wrongfulness of his conduct' as stated

[15] At trial, the defendant also sought to establish that he was entitled to prevail under the volitional prong of the insanity test because he lacked substantial capacity to control his conduct within the requirements of the law. See footnotes 5 and 17 of this opinion. On appeal, however, the defendant does not take issue with the jury's rejection of his claim under that prong of § 53a-13 (a).

[16] We note that our opinion in *Wilson* was not released until nearly one year after the conclusion of the trial in this case.

[17] "Under the cognitive prong [of the insanity defense], a person is considered legally insane if, as a result of mental disease or defect, he lacks substantial capacity . . . to appreciate the . . . [wrongfulness] of his conduct. . . . Under the volitional prong, a person also would be considered legally insane if he lacks substantial capacity . . . to conform his conduct to the requirements of law." (Citation omitted; internal quotation marks omitted.) *State* v. *Wilson*, supra, 242 Conn. 613.

in § 53a-13 (a) if a mental disease or defect causes him both to harbor a distorted perception of reality and to believe that, under the circumstances as he honestly perceives them, his actions do not offend societal morality, even though he may also be aware that society, on the basis of the criminal code, does not condone his actions."[18] Id., 622.

The Appellate Court, with one judge dissenting, rejected the defendant's claim, concluding that the defendant was not entitled to the charge that he had requested because he "failed to present sufficient evidence to warrant [a jury] instruction that distinguished between legal and societal standards of wrongfulness under § 53a-13 (a)." *State* v. *Cole*, supra, 50 Conn. App. 322. In particular, the Appellate Court concluded that the defendant had not adduced "any evidence that at the time of the killing he was aware that his actions were illegal but believed that they did not offend societal morality . . . ."[19] Id., 323.

Judge Lavery[20] dissented from the majority opinion of the Appellate Court, in which the majority rejected the defendant's claim that he was entitled to a new trial because of the trial court's failure to give the requested charge. Id., 332 (*Lavery, J.,* dissenting). In Judge Lavery's view, "the defendant [had] produced sufficient evidence from which a jury reasonably could have concluded that due to his mental illness, he misperceived reality in that he believed the victim was about to kill

---

[18] In *Wilson*, we also concluded that a defendant, therefore, "would be entitled to prevail under § 53a-13 (a) if, as a result of his mental disease or defect, he sincerely believes that society *would* approve of his conduct *if* it shared his understanding of the circumstances underlying his actions." (Emphasis in original.) *State* v. *Wilson*, supra, 242 Conn. 622–23.

[19] The Appellate Court also noted that the defendant had "not satisfied his burden of persuasion that the trial court's instructional omission constituted harmful error." *State* v. *Cole*, supra, 50 Conn. App. 323.

[20] Since the Appellate Court's release of its opinion in this case, Judge Lavery has been appointed Chief Judge of that court.

him and, on the basis of this misperception, he did not substantially appreciate that his action in self-defense was contrary to social morality." Id., 337 (*Lavery, J.,* dissenting). Judge Lavery further concluded that the trial court's failure to give the requested charge was not harmless. Id.

On appeal to this court, the defendant renews his contention that, under *State* v. *Wilson*, supra, 242 Conn. 605, the trial court's failure to instruct the jury regarding the definition of the term "wrongfulness" in accordance with standards of societal morality was improper.[21] We disagree.

As the Appellate Court determined, and as both parties acknowledge, our resolution of this appeal is guided by our recent opinion in *State* v. *Wilson*, supra, 242 Conn. 605. In *Wilson*, the defendant, Andrew Wilson, adduced evidence in support of his affirmative defense of insanity under § 53a-13 (a) that he had shot and killed an acquaintance, Jack Peters, while suffering from a mental disease or defect that had manifested itself in a delusional belief that Peters was involved in a conspiracy to destroy Wilson's life and the lives of others. Id., 607–609. Although Wilson understood that killing Peters was against the law, he presented evidence that he sincerely believed that he had "saved the world"; (internal quotation marks omitted) id., 626; by committing

---

[21] We note that, in his appeal to the Appellate Court, the defendant did not claim that he was entitled to the requested charge because such a charge was necessary either to inform the jury of the precise nature of his affirmative defense, namely, that he had killed the victim in the delusional, but good faith, belief that he was acting in self-defense, or to advise the jury that self-defense is a legitimate response to an unprovoked attack. Rather, the defendant's claim of instructional impropriety was limited to the contention that the trial court had failed to define wrongfulness as including a moral component. On appeal to this court, the arguments raised by the parties in accordance with the certified issue also are so limited.

the crime and, therefore, that his conduct was morally justified.[22] See id., 626–27.

In addressing Wilson's claim that the trial court in his case improperly had failed to define wrongfulness under § 53a-13 (a) as including a moral component, we concluded that the legislature intended that term to apply to an accused who may have known that his conduct was unlawful, but who, based on his mental disease or defect, believed that his conduct was morally justified. See id., 615. In resolving "[t]he more difficult question . . . [of] how properly to define the moral element inherent in the term 'wrongfulness' under § 53a-13 (a)"; id.; we sought to balance "the concepts of societal morality that underlie our criminal law with the concepts of moral justification that motivated the legislature's adoption of the term 'wrongfulness' in our insanity statute." Id., 623. In so doing, we concluded that "[t]he trial court should inform the jury that a person may establish that he was legally insane if he proves that, at the time he committed the prohibited conduct, due to mental disease or defect he suffered from a misperception of reality and, in acting on the basis of that misperception, he did not have the substantial capacity to appreciate that his actions were contrary to societal morality, even though he may have been aware that the conduct in question was criminal. The trial court should instruct the jury further that, in deciding whether the defendant had substantial capacity to appreciate that his conduct was contrary to societal morality, it must not limit its inquiry merely to the defendant's appreciation that society, objectively speaking, condemned his actions. Rather, the jury

---

[22] For example, a forensic psychiatrist who had examined Wilson "described [Wilson's] belief in a higher moral duty as something akin to a person believing, during World War II, that he or she had a moral obligation to assassinate Adolf Hitler even though that person understood that this killing would be illegal." *State* v. *Wilson*, supra, 242 Conn. 626–27.

should be instructed that it must also determine whether the defendant maintained a sincere belief that society would condone his actions under the circumstances as the defendant honestly perceived them."[23] Id., 623–24. Because Wilson had presented substantial evidence that he knew that his conduct was illegal but nevertheless believed that his actions were justified under principles of societal morality, we concluded that the trial court's failure to instruct the jury regarding the moral component of wrongfulness under § 53a-13 (a) constituted harmful error, thereby entitling Wilson to a new trial. Id., 631, 633.

Consistent with our holding in *Wilson*, a defendant is entitled to an instruction defining "wrongfulness" in terms of societal morality when, in light of the evidence, the distinction between illegality and societal morality bears upon the defendant's insanity claim. As the defendant, himself, acknowledges, however, most cases in which the insanity defense is raised involve crimes sufficiently serious such that society's moral judgment regarding the accused's conduct will be identical to the legal standard reflected in the applicable criminal statute. E.g., *People* v. *Stress*, 205 Cal. App. 3d 1259, 1275, 252 Cal. Rptr. 913 (1988) ("we agree with the commentators that in most instances legal wrongfulness and moral wrongfulness are equivalent"); *People* v. *Serravo*, 823 P.2d 128, 138 (Colo. 1992) ("in most cases involving the defense of legal insanity there will

---

[23] We nevertheless rejected Wilson's claim that morality must be defined in purely personal, rather than societal, terms under the cognitive prong of § 53a-13 (a). *State* v. *Wilson*, supra, 242 Conn. 615–16. Thus, we indicated that an instruction explaining the moral component of wrongfulness should inform the jury that "if it finds that the defendant had the substantial capacity to appreciate that his conduct both violated the criminal law and was contrary to society's moral standards, even under the circumstances as he honestly perceives them, then he should not be adjudged legally insane simply because, as a result of mental disease of defect, he elected to follow his own personal moral code." Id., 624.

be no practical difference between a definition of 'wrong' in terms of legal wrong and a definition of 'wrong' in terms of societal standards of morality . . . because, for the most part, the proscriptions of the criminal law generally reflect the moral prohibitions of the social order"); *State* v. *Worlock*, 117 N.J. 596, 610, 569 A.2d 1314 (1990) ("[because] [l]aw is largely the crystallization of societal morals . . . [r]arely would an allegedly illegal act not also be wrongful morally"); *State* v. *Crenshaw*, 98 Wash. 2d 789, 799, 659 P.2d 488 (1983) ("[m]ost cases involving the insanity defense involve serious crimes for which society's moral judgment is identical with the legal standard"). Thus, it will be the unusual case "in which the distinction between wrongfulness and criminality [will] be determinative . . . ." *State* v. *Wilson*, supra, 242 Conn. 622 n.21.

In contrast to *Wilson*, this is not a case in which the distinction between illegality and morality bears upon the defendant's insanity defense. The primary thrust of the defendant's claim is that, as a result of his mental disease or defect, the defendant misperceived reality and honestly believed that he was acting in self-defense when he shot and killed the victim.[24] Consequently, an

---

[24] As we previously have indicated; see footnote 7 of this opinion; the defendant did not claim self-defense under General Statutes § 53a-19 (a). "Pursuant to § 53a-19 (a) . . . a person may justifiably use deadly physical force in self-defense *only if he reasonably believes* both that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, and (2) that deadly physical force is necessary to repel such attack. . . . We repeatedly have indicated that the test a jury must apply in analyzing the second requirement, i.e., that the defendant reasonably believed that deadly force, as opposed to some lesser degree of force, was necessary to repel the victim's alleged attack, is a subjective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable." (Citations omitted; emphasis altered; internal quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 285–86, 664 A.2d 743 (1995). In this case, the defendant could not establish the *reasonableness* of his belief, first, that the victim was using or about to use deadly physical force against him, or about to inflict great bodily harm, and second, that deadly force was necessary to repel her attack.

instruction apprising the jury that the term "wrongfulness" in § 53a-13 (a) involves a moral component was unnecessary in this case because society recognizes that one who acts in self-defense is justified in doing so under both legal and moral standards.[25] Based on the instruction given in this case, the jury would have found the defendant not guilty by reason of mental disease or defect had he established, by a preponderance of the evidence, that, as a result of his delusional belief system, he harbored a good faith belief that he had no choice but to shoot the victim because she was about to shoot him. As its guilty verdict indicates, however, the jury was not persuaded by the evidence that the defendant presented in support of his affirmative defense.

Thus, unlike Wilson, who presented evidence sufficient to support a jury determination that he appreciated the *illegality* of his conduct, but, as a result of his mental disease or defect, sincerely believed that he had acted in a manner that was justified under principles of *societal morality*; see id., 627; the defendant in this case presented no evidence to suggest that, when he killed the victim, he distinguished between the legality of his conduct, on the one hand, and the morality of that conduct from society's perspective, on the other hand. Indeed, because self-defense is justified under both legal and moral principles, it is difficult to conceive

Instead, the defendant presented evidence that, although his perception of the need to use deadly physical force against the victim was not *objectively reasonable* as required under § 53a-19 (a), he honestly believed that such force was justified as a result of the delusions brought about by his mental disease or defect.

[25] We reiterate that the defendant has not challenged the trial court's failure to give the requested instruction on the ground that without it, the jury could not have been expected to understand that self-defense is a legitimate and recognized exception to the general prohibition against conduct that is calculated to cause harm to another. See footnote 21 of this opinion.

of a scenario in which the fine distinction between criminality and societal morality would ever be determinative in a case such as this one, in which an accused claims that, because of a mental disease or defect, he honestly but irrationally believed that he was defending himself when he committed the criminal act. Thus, as the Appellate Court concluded, the trial court's failure to define wrongfulness in terms of societal morality did not constitute harmful error because "the success of [the defendant's] affirmative defense did not hinge on his appreciation of the morality of his actions." *State v. Cole*, supra, 50 Conn. App. 323–24.

The defendant also presented some evidence to suggest that, as a result of his mental illness, he was oblivious to the difference between right and wrong when he shot and killed the victim. In particular, the defendant testified that he did not know what had caused him to shoot the victim, and characterized his offending conduct as a subconscious reaction prompted by his confusion over the victim's behavior. Although this explanation of his state of mind at the time of the shooting contradicts his testimony—and the testimony of Borden and Ramos-Grenier—that he shot the victim in the good faith belief that he was acting in self-defense, the jury presumably could have chosen to credit the defendant's testimony that he had reacted subconsciously in shooting the victim. If so credited, this evidence, considered with the testimony of Borden and Ramos-Grenier that the defendant was suffering from a serious mental illness when he shot the victim, constituted a possible alternative theory of defense under the cognitive prong of § 53a-13 (a).

This alternative theory, however, also does not implicate the distinction between illegality and morality that the defendant claims was necessary to the jury's understanding of his affirmative defense. Under this alternative theory, the defendant was reacting, unthinkingly,

to the circumstances. Consequently, this alternative theory, which posits a complete *lack of cognition* on the part of the defendant when he shot the victim, would not be advanced by an instruction concerning the definition of wrongfulness—such as the instruction that the defendant had requested—through which the court explains to the jury that an accused is not criminally responsible for his offending act if, as a result of his mental disease or defect, he harbors a belief that his conduct is morally justified, on the basis of self-defense or otherwise. In other words, the instruction sought by the defendant, which focuses on an accused's *belief system*, would have no bearing on the defendant's claim that he shot the victim *without any conscious awareness of why he was doing so.*

We, therefore, conclude that, under the facts of this case, the distinction between criminality and societal morality that we found to be highly relevant to the defendant's claim in *Wilson* bears no such relevance to the insanity defense in this case. Consequently, the trial court's failure to define wrongfulness as including a moral component for purposes of § 53a-13 (a) could not have possibly inured to the detriment of the defendant. Accordingly, the Appellate Court properly determined that the defendant was not entitled to such an instruction.

The judgment of the Appellate Court is affirmed.

In this opinion SULLIVAN, CALLAHAN and VERTEFEUILLE, Js., concurred.

MCDONALD, C. J., concurring in the result. Having disagreed with the decision in *State* v. *Wilson*, 242 Conn. 605, 645–48, 700 A.2d 633 (1997) (*McDonald, J.,* dissenting), I agree with the result in this case.