******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* RICHARD SHENKMAN
(AC 36408)

Gruendel, Prescott and Bishop, Js.

*Argued September 19—officially released December 9, 2014*

(Appeal from Superior Court, judicial district of
Hartford, Dewey, J.)

*Adele V. Patterson*, senior assistant public defender,
for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney,
with whom, on the brief, were *Gail P. Hardy*, state's
attorney, and *Vicki Melchiorre*, supervisory assistant
state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Richard Shenkman, appeals from the judgments of conviction, rendered after a jury trial, in docket number CR-09-633370, of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (C), criminal violation of a protective order in violation of General Statutes § 53a-223, and carrying a pistol without a permit in violation of General Statutes § 29-35, and, in docket number CR-09-224139, of threatening in the second degree in violation of General Statutes § 53a-62 (a) (1), threatening in the second degree in violation of § 53a-62 (a) (2), assault in the third degree in violation of General Statutes § 53a-61 (a) (1), threatening in the first degree in violation of General Statutes § 53a-61aa (a) (1) (A), interfering with an officer in violation of General Statutes § 53a-167a, attempt to commit assault of public safety personnel in violation of General Statutes §§ 53a-49 and 53a-167c, and arson in the first degree in violation of General Statutes § 53a-111 (a) (4). On appeal, the defendant claims that (1) the trial court improperly denied his motion for a bill of particulars, (2) certain convictions violate the prohibition against double jeopardy, and (3) the court improperly instructed the jury on the defense of mental disease or defect. We affirm the judgments of the trial court.

From the evidence adduced at trial, the jury reasonably could have found the following facts. The defendant and the victim, Nancy Tyler, married in 1993. Their relationship deteriorated in subsequent years. The defendant had a bad temper and was very controlling. On one occasion in 2000, the defendant furiously berated Tyler in an intimidating manner while backing her up against a wall; on another in 2003, the defendant threw her across a room, placed his hands around her neck, and attempted to choke her. The marriage reached its nadir in January, 2006, when the defendant kicked Tyler and their children out of the family home in South Windsor. Tyler filed for divorce soon thereafter.

The defendant only grew more enraged with that development, and tried to force Tyler to stay with him, telling her he could not live without her. When she refused, he responded with various threats. The defendant repeatedly told Tyler that he was going to commit suicide in front of their children as part of an effort to "destroy" her. He warned Tyler, an attorney by profession, that he "was going to have [her] law license taken away so [she] couldn't work anymore," and he frequently contacted the partners at her law firm and "tried to drag them into the divorce [and] to tell them that they should fire" her. On numerous occasions in the past, the defendant told Tyler that "he had learned over time that the crazier he acted the more he got his way. And at one point [they] talked about . . . a number of lawsuits going on and [she] asked him, how do you

handle these things, how is it that they always just go away, and he said, because I act crazy and they give up." When the defendant became controlling, "the wisest response [in her view] was to give in because his behavior would escalate, he would get nastier and nastier and yell and scream and slam around [and] make everybody miserable, so the easiest thing was just to give in."

During their divorce proceeding, the defendant called Tyler's attorney, John Harvey, at home late one night and cautioned, "I will lie, cheat or do whatever I have to do to use this system to get payback." The defendant told Harvey "over and over and over" that "[h]e just wanted to see [Tyler] destroyed." The defendant similarly sent a handwritten letter dated November 27, 2008, to Michael Riggs, another attorney who represented Tyler in the dissolution proceeding, which stated in relevant part that "[t]he 'war [with Tyler]' enters year four next month. We are only in the middle chapters of this nasty saga. Watch the local [and] national newscasts the week of Dec[ember] 14 for the next chapter with reenforcements entering the battlefield." The defendant previously had visited Harvey's office and threatened to do something to the family home in South Windsor. On another occasion, the defendant threatened that "[h]e was going to destroy everything so that [Tyler] ended up with nothing."

The court dissolved the marriage in 2008, and entered certain financial orders. When the defendant wilfully violated those orders, the court on June 16, 2009, found him in contempt. The court then ordered the defendant to vacate the family home, located at 96 Tumblebrook Drive in South Windsor (house), and continued the matter "for compliance until July 7, 2009." At that time, the defendant owed Tyler approximately $180,000, and title to the house had vested in Tyler. Pursuant to the court's outstanding orders, the defendant "either had to pay [Tyler] the money [by July 7, 2009] or had to vacate the house so that [she] could sell it and pay the debts . . . ." At that time, Tyler's safety was the subject of a protective order that precluded the defendant from having any contact with her.[1]

On July 7, 2009, the defendant and Tyler were due to appear in court for further proceedings on the motion for contempt. Tyler arrived at her office in downtown Hartford early that morning. Shortly after 8 a.m., she exited the building to pick up a garment from a nearby dry cleaning business. Once outside, she saw the defendant's van parked across the street. Mindful of the protective order, she quickly picked up her garment and headed back to the office. As she entered the elevator to her office building, Tyler called Susan Arnold, a close friend, and headed to the parking garage where her vehicle was located. When she approached the vehicle, the defendant "came out of nowhere . . . and grabbed [Tyler] . . . and he had a gun in his hand." Arnold,

who remained on the phone with Tyler as the encounter commenced, recognized the defendant's voice. Tyler urged Arnold to contact the police as the defendant grabbed her cell phone from her hand. Arnold immediately called 911, and then called Tyler's cell phone to no avail. In response, the South Windsor Police Department was notified of a possible kidnapping involving the defendant and Tyler. Police Chief Gary Tyler[2] and Commander Matthew Reed, who were on a general patrol of the community at that time, proceeded to the house, where they observed six infrared cameras mounted outside, windows that were covered from the inside, and a series of metal pipes in the backyard that were "crisscrossed" in "what appeared to be an elaborate blockade . . . ." They vacated the premises when informed that the defendant and Tyler were approaching. Another officer, Mark Halibozek, remained in the vicinity of the house to maintain surveillance of the property. The Capital Region Emergency Services Team also was activated, from which a tactical team and a hostage negotiation team were assembled.[3]

After grabbing Tyler's cell phone in the parking garage, the defendant shoved her toward her vehicle. He then forced her into the driver's seat and ordered her to drive them to the house. Seated behind her in the vehicle, the defendant warned her that if she made any signal or attempt for help, he would shoot her. Tyler complied and drove to South Windsor, eventually parking the vehicle in the house's attached garage. The defendant then manually locked the garage door, forced Tyler inside the house, and fortified the door with "a big heavy steel bar" that he inserted into brackets mounted to the sides of the door.

Once inside the house, the defendant handcuffed Tyler's right wrist to his left wrist. As Tyler recounted at trial, he then said that "he had things to tell me and things to show me and that things had been done that weren't right and he was going to fix them and he had things I needed to see because I had taken everything away from him, his family, his life, his work—I had taken everything away from him, but he was going to fix it." The defendant told Tyler that he was going to provide proof of his cancer diagnosis and became angry when he could not find it.[4] He then informed her that "it's all up to the police how this day ends. You could walk out of here at the end of the day if the police handle this right."

The defendant led Tyler into the living room and turned on two monitors that were connected to the outside cameras. When the monitors displayed two people in the front yard, the defendant remarked, "I didn't think they would be here this quickly" and "I'm not ready . . . I've got things all set up here, but I needed a little bit more time." The defendant then placed a telephone call to the South Windsor Police Department

and angrily informed them to get "the F out of his yard, I don't want any F'n police" on the property. When the officers did not depart as fast as he wanted, the defendant told the police dispatcher that "you people better take me seriously, you don't know what you're dealing with here." At that point, the defendant picked up the gun and fired a shot "right across the front" of Tyler toward a kitchen wall. He then hung up the telephone.

Minutes later, the defendant again called the police. He demanded to speak with a hostage negotiator, stating that "[t]his is a hostage situation." He then told Tyler that the police "don't know what they're dealing with. I've been working for eight months on this. I've been getting ready for this for eight months. I have plans and contingency plans. I have everything all laid out, they better take me seriously." He made Tyler sit holding a rope with a noose on it, and told her "that's what I'm going to hang you with, I think you ought to hold onto it for a while." He showed her all sorts of paperwork on "things that he had downloaded from the Internet, and he said, I did all the research on all the different ways to die, and I'm not sure if I'm going to shoot you or hang you . . . ." Tyler sat terrified holding the noose for more than one-half hour as the defendant continued to call the police and make demands.

The police responded by evacuating the public from the vicinity of the house and setting up a perimeter around the area. Among law enforcement personnel called to the scene were crisis negotiators, snipers, a hazardous material team, and a tactical SWAT team. In total, approximately 80 to 100 law enforcement personnel responded to the emergency at the house. The police chief authorized the officers to shoot to incapacitate the defendant, so long as they did not endanger Tyler.

During a subsequent telephone call to the police, the defendant demanded to speak with a negotiator and stated that he was on a suicide mission. The defendant then spoke with Michael Thompson, a South Windsor police officer and crisis negotiator, for approximately twenty minutes. The conversation ended after the defendant grew upset with Thompson's representation that no criminal charges had been filed against him at the time. The defendant informed Thompson that "he knew they were going to charge him criminally . . . he understood that," so he refused to speak further with Thompson.

The defendant later spoke with other crisis negotiators over the course of approximately nine hours, including Detective Donald Skewes of the Vernon Police Department and Officer Lisa Arsenault of the Glastonbury Police Department. When Skewes took over the negotiations from Thompson, the defendant informed him that "you haven't trained for this. I put

about eight months of training into—or planning into this event." During those conversations, Tyler heard the defendant state that "he had set this whole thing up, the house was completely booby trapped. He said [that] he had the front door wired so that if anybody tried to get in, the front door would explode; all the openings were set with explosives. He had motion detectors on the roof because there were skylights, and the motion detectors were set to explode if anybody tried to get onto the roof. He said [that] he had set up propane pockets in places that nobody would know around the house."[5] Tyler saw propane tanks in the basement and indoor pool areas of the house. The defendant also told Tyler that "he had gone down to West Virginia and had bought sixty-five pounds of explosives, and that was going to be his key to freedom . . . . [T]hat was his bargaining chip because . . . [h]e was going to turn in the seller of the explosives to the Homeland Security people in exchange for some kind of plea deal."

At one point, the defendant demanded a copy of a hostage negotiation manual from the police. When Tyler inquired as to his rationale, the defendant explained that he already had downloaded a copy from the Internet and simply was testing the police, as he wanted to see if they would provide the "real thing," and wanted to compare it to his downloaded copy. When the police did not promptly comply with his request, the defendant became furious. As Tyler testified: "He was yelling and screaming on the phone [and told them] send me the goddamn manual . . . you're not meeting my demands, you're not taking me seriously. I'm in control here . . . you're not listening, send me the manual or she's going to die." The defendant then placed the gun against Tyler's head and started screaming that if they didn't send the manual, she was going to die. He started counting down and warned that if he didn't receive the manual when he finished, he would shoot her. The police then faxed the manual to the defendant.

As these events unfolded, the defendant monitored media coverage, scouring the Internet in search of news articles on the situation. At one point, he told Tyler that "if they start putting up stories about this, you're dead." When a story later appeared on the Hartford Courant website, the defendant again became enraged. While speaking to police negotiators on the telephone, the defendant held the gun to Tyler's head and instructed her to beg for her life. As she testified, the negotiators "kept saying, we can't make [the media] do anything, we don't control the newspaper, and [the defendant] kept saying she's going to die, get those stories down or she is dead. And he had me screaming into the phone, and he said you tell them . . . there's a gun to your head and you're gonna die if they don't get those stories down, and I was screaming and crying saying please take the stories down because we could see them up

there and nothing was happening, and he had the gun to my head, and I knew it was loaded."

Later in the day, the defendant told Tyler that "we should never have gone through this, we should never have split up, we should never have gotten the divorce." When he explained that he could not live without her and asked her to remarry him, Tyler answered yes in an effort to save her life. He then told her that the judge who had presided over their divorce proceeding should perform the ceremony, and then stated that they would need a priest as well, both for the marriage and to administer her last rites. Perplexed, Tyler asked why she would need last rites; the defendant replied, "you deserve last rites; you're going to need them." The defendant then demanded a priest and a marriage license from the police, who eventually faxed such a license to the defendant. All discussion of remarriage ended at that point.

When the defendant complained that negotiators had not met his demand to furnish a priest, he again forced Tyler to beg over the telephone. He made her "beg for a priest during a countdown when he had the gun to [her] head, and [she] was crying and he was screaming [that] she's gonna die, you're gonna kill her, you need to get her a priest." The defendant then tried to fire the gun while holding Tyler by her hair. After the gun jammed and a bullet popped out, the defendant again attempted to fire the gun. Tyler raised her hand in self-defense, and the defendant then struck her on the head, causing her to fall to the ground. The blow left Tyler dizzied, and she thought that the defendant had "cracked open" her head.

The defendant thereafter explained to Tyler that "this was not going to end well" because the police were not meeting his demands and did not appreciate that "he was in control of the situation; he had this all planned; he knew exactly what was going to happen . . . ." The defendant then noticed on his surveillance monitors a police robot approaching the house.[6] This further upset the defendant, who screamed at the negotiators to remove the robot from the property. Infuriated, the defendant smashed a table and began kicking and throwing things. He then turned to Tyler and said, "[T]his is it, I'm done with you, we're going down in the bunker; this is it, it's all over. It's over for you and this is over." The defendant then dragged Tyler across the room and toward the basement. Tyler resisted at first, telling him "don't make me go down there. I don't want to die down there." The defendant then stated, "you get up and get down there or I'll throw you down the stairs" to the basement. She complied and, upon reaching the basement, the defendant told her that he was "going to blow the house from there." He then handcuffed her to an eyebolt on the wall farthest from the door.

The defendant resumed his discussions with the negotiators and appeared "worse than he had been the entire day." After screaming at them, he made Tyler speak on the telephone. When he asked Tyler what the negotiator was asking, Tyler replied that the negotiator wanted to know if he had a gun. The defendant then announced "yeah, I have a gun" and fired the weapon at a wall. The gun was one foot from Tyler's face when the shot was fired.

The defendant continued to yell at negotiators about the robot in the front yard and threatened to "blow the house" if it wasn't removed. He then screamed, "I'm done, this is over," and ran out of the basement. Tyler heard the defendant's steps pounding across the kitchen floor above and realized that she had an opportunity to flee. She managed to yank the eyebolt out of the wall and ran to a door. She testified that she "stopped at the door and . . . remember[ed] thinking is it going to blow. I'm either going to die with a gun to my head or I go out the door and I die or maybe I don't. And I opened the door and, I stood there for a minute [and then] I ran across the yard." A SWAT team member came to her aid and removed her from the scene. At that time, it was approximately 8:30 p.m.

The police then removed the robot from the property and rescinded the order to shoot the defendant. They repeatedly instructed the defendant to exit the house, but he refused. At 9:30 p.m., the police fired fifteen to twenty-five gas canisters into the house through a large picture window. Those canisters contained nonflammable pepper spray, an irritant intended to flush the defendant out of the house. The defendant nevertheless remained in the house. At approximately 9:45 p.m., officers observed a blue and white flame coming from the center of the roof of the house.[7] Officer Matthew Mainieri of the South Windsor Police Department testified that although he initially observed smoke, he "then . . . observed flames rising above the roofline . . . [and] was able to see flames higher than the peak of the garage roof." Mainieri found that to be unusual because "[b]ased on [his] experience as a volunteer firefighter, it generally takes some time for fires to get that big." After five minutes, the blue flames died down to just a yellow flame and then turned to black smoke.

When the canisters were fired through the picture window, they provided officers a view inside the house. Five minutes after the initial fire subsided, officers witnessed a person tossing an item on fire from the lower right corner to the upper left corner of the window, setting fire to the curtains inside. Approximately thirty minutes later, the fire intensified, ultimately engulfing the entire house over the course of two hours. At one point, the defendant appeared at the basement door and fired two rounds into the yard in the direction of where a SWAT team was deployed. The officers dove

for cover, but did not return fire. The defendant then retreated into the house.

After the roof of the house had collapsed, Mainieri testified that "[e]ventually the basement area became consumed with fire and at the last possible moment [the defendant] crawled out the back door." He then proceeded across the yard with a gun raised to his head. Officers ordered him to drop the weapon, but the defendant refused and a standoff ensued. The police fired a nonlethal round that struck the defendant's arm, causing him to drop the gun. They then applied a Taser[8] on the defendant and attempted to handcuff him. When he resisted, the police administered a "dry stun"[9] before finally apprehending the defendant.

The defendant then was transported to a nearby hospital, where the police seized, inter alia, certain articles of clothing and ten .25 caliber bullets from him. Subsequent testing at the state forensic science laboratory confirmed that "a petroleum product consistent with gasoline" was present on the defendant's shoe and pants, and that a flammable "medium boiling range petroleum distillate" that was not gasoline was present on the defendant's sock. The police also recovered an operable .25 caliber Browning semiautomatic pistol from the backyard of the house. The defendant did not have a permit to possess that pistol. In addition, several empty propane tanks were found inside the house and one was found on an outdoor patio.

After being charged with the aforementioned crimes, the defendant filed a notice of his intent to rely on the defense of mental disease or defect. The case proceeded to trial in the fall of 2011, at the conclusion of which the jury rejected that defense and found him guilty on all counts. The court rendered judgments of conviction consistent with the jury's verdicts and thereafter sentenced the defendant to a total effective term of seventy years incarceration. This appeal followed.

I

The defendant first claims that the court improperly denied his motion for a bill of particulars. He argues that the court's refusal to do so impaired his ability to prepare a double jeopardy defense. We disagree.

"A motion for a bill of particulars is addressed to the sound discretion of the trial court. . . . [A]n abuse of discretion in the denial of a motion for a bill of particulars can be premised only upon a clear and specific showing of prejudice to the defense . . . . The defendant has the burden of showing why the additional particulars were necessary to the preparation of his defense. . . . The sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution guarantee a criminal defendant the right to be informed of the nature and cause of the charges against him with sufficient precision to enable

him to meet them at trial. . . . [That] the offense should be described with sufficient definiteness and particularity to apprise the accused of the nature of the charge so he can prepare to meet it at his trial . . . are principles of constitutional law [that] are inveterate and sacrosanct." (Citations omitted; internal quotation marks omitted.) *State* v. *Vumback*, 263 Conn. 215, 221–22, 819 A.2d 250 (2003).

The following additional facts are relevant to this claim. Weeks before trial commenced, the defendant filed a motion for a bill of particulars that sought to have the state identify the specific statutory conduct that he was alleged to have committed and the specific acts that allegedly constituted the commission thereof. The state responded by filing long form informations detailing the specific charges against the defendant. The court heard argument on the defendant's motion on September 12, 2011. At that time, defense counsel argued that the informations did not specify precisely how the defendant committed the alleged statutory violations with respect to the charges of criminal violation of a protective order in violation of § 53a-223, threatening in the second degree in violation of § 53a-62 (a) (1), threatening in the second degree in violation of § 53a-62 (a) (2), assault in the third degree in violation of § 53a-61 (a) (1), threatening in the first degree in violation of § 53a-61aa (a) (1) (A), interfering with an officer in violation of § 53a-167a, attempt to commit assault of public safety personnel in violation of §§ 53a-49 and 53a-167c, and arson in the first degree in violation of § 53a-111 (a) (4).

In response, the state's attorney made an oral proffer on the record with respect to the specific factual bases underlying those charges. She stated in relevant part: "It's disingenuous for counsel to claim that he doesn't understand the basis of the violation of the protective order when his client kidnaps . . . Tyler at gunpoint, puts her in the car, and drives her to the home . . . on Tumblebrook [Drive] in South Windsor. Clearly, all of that violates the protective order. It's a protective order where he is to have no contact with . . . Tyler. Obviously, putting a gun to her head and kidnapping her and putting her in a car would certainly violate the protective order, and I think that counsel could figure that out from the police reports.

"With regard to the threatening counts, the threatening that deals with the physical assault; he hit her in the head either with his hand or with the gun in order to get her to go downstairs and threatened to throw her down the stairs into the bunker area, or what they're describing as the bunker area of the home, when he decided it was time for them to go to the bunker.

"With regard to the verbal threatening, counsel is aware of the negotiation tapes where he repeatedly threatens to kill her, threatens to kill himself in front

of her, threatens to blow up the house, and threatens to do various things to her of a violent nature.

"With regard to the assault third, that would also be hitting her in the head with either the gun or his hand. I believe it was the gun.

"With regard to the threatening first, the victims there would be both the police and . . . Tyler. The defendant indicates to police several times that he has put propane pockets throughout the house, and that he has sixty-five pounds of explosives in the house and intends to blow up the house if the police don't meet his demands; that would be threatening in the first degree.

"With regard to the interfering with officers, specifically, he interfered with . . . the three police negotiators who were telling him to release [Tyler], let her go, to come out with his hands up. He interfered with the other officers, the SWAT team officers. When he did come out of the house—finally when the house was engulfed in flames, put the gun to his head, refused to drop the gun, was hit with a foam bullet, dropped the gun, bent down and picked it up again in violation of police orders, continued to try to get away from the police after [the police] knocked the gun out of his hand I believe the second time, and he turned and began to walk away from at least a dozen police officers who had the house surrounded and were ordering him over loud speakers and with their unassisted voices to stop, to get down on the ground and to drop the weapon. . . .

"With regard to . . . the attempted assault on the police officer. . . . When the defendant came out, he fired at the SWAT officers who were in the rear yard attempting to take him into custody, causing the officers to back up. This was witnessed by Officer Mainieri of the South Windsor Police Department who saw the officers retreat when the defendant came out and fired the gun at those officers. I do not have the names of those specific officers, nor do I believe that that is necessary for counsel to defend this case. There were SWAT officers surrounding this house, the defendant came out, fired the gun, not up in the air, at the officers, causing them to retreat further back into the woods in back of the house in order to avoid being shot. . . .

"With regard to the arson, Your Honor, I don't believe there's anything that requires me to indicate or to prove the exact location that he started the fire in the house. It is the state's contention he is the only one in the house. Other means of [how] the fire started have been ruled out by the fire marshal, he is the only one left in the house. He indicated that he had propane pockets, he indicated he had explosives, he had matches, [and] he had Bic lighters throughout the house. He had ample means to start the fire. It is not incumbent upon the state to prove exactly where the fire was started in the house." Following that proffer by the state's attorney,

the court denied the defendant's motion for a bill of particulars.[10]

As our Supreme Court repeatedly has observed, "this court has on numerous occasions adverted to sources extrinsic to the specific count or information to determine whether the defendant was sufficiently apprised of the offense charged" in reviewing the denial of a motion for a bill of particulars. *State* v. *Spigarolo*, 210 Conn. 359, 384, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989); see also *State* v. *Vumback*, supra, 263 Conn. 228; *State* v. *Kyles*, 221 Conn. 643, 654, 607 A.2d 355 (1992). For example, in *State* v. *Beaulieu*, 164 Conn. 620, 624, 325 A.2d 263 (1973), the court permitted the state's attorney, following a motion by the defendant for a bill of particulars, to "read into the record a detailed statement of the facts claimed to constitute the crime charged . . . ." The court then denied the motion for a bill of particulars. On appeal, our Supreme Court reasoned that when "a defendant is fairly informed of the charges against him so that he may prepare a proper defense, a bill of particulars is unnecessary and may properly be denied." Id., 625. The court emphasized that the "information [was] read into the record by the state's attorney in advance of the trial" in determining that the defendant was "fairly apprised" of the precise charges against him. Id., 625–26. In light of the foregoing, the court concluded that the trial court did not abuse its discretion in denying the defendant's motion. Id., 626.

As in *Beaulieu*, the proffer by the state's attorney in the present case fairly apprised the defendant of the facts claimed to constitute the charged offenses. Defense counsel apparently agreed, stating at the conclusion of that proffer that "what [the state's attorney] just recited is what she should allege in the long form information . . . ." The complaint lodged before the trial court, then, assailed not so much the adequacy of the state's description, but rather the manner in which it was memorialized. Indeed, his trial counsel concluded his argument by stating that said description needed to be provided "in writing" to the defendant. Defense counsel provided no authority for that proposition before the trial court, nor does his appellate counsel in this appeal. That proposition is contrary to Connecticut law. See *State* v. *Beaulieu*, supra, 164 Conn. 624–26 (court did not abuse discretion in denying bill of particulars after state made oral proffer detailing facts on which state would proceed); *State* v. *Madagoski*, 59 Conn. App. 394, 403–404, 757 A.2d 47 (2000) (court did not abuse discretion in denying bill of particulars when defendant had access to state's disclosure that apprised him of facts on which state would proceed), cert. denied, 255 Conn. 924, 767 A.2d 100 (2001).

Furthermore, the defendant has not demonstrated, as he must, that he was prejudiced by the court's denial

of his motion for a bill of particulars. "[A] defendant can gain nothing from the claim that the pleadings are insufficient without showing that he was in fact prejudiced in his defense on the merits and that substantial injustice was done to him because of the language of the information. . . . To establish prejudice, the defendant must show that the information was *necessary* to his defense, and not merely that the preparation of his defense was made more burdensome or difficult by the failure to provide the information." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Vumback*, supra, 263 Conn. 227–28.

In this appeal, the defendant claims that ambiguities in the informations and the state's proffer hindered his ability to prepare a double jeopardy defense. That contention overlooks the fact that, in cases in which "the charging instrument . . . did not specify the particular acts for which the defendant was charged"; *State* v. *Quint*, 97 Conn. App. 72, 80 n.4, 904 A.2d 216, cert. denied, 280 Conn. 924, 908 A.2d 1089 (2006); the courts of this state must "resolve the ambiguity in the defendant's favor . . . for double jeopardy purposes and assume that the charged offenses arose out of the same act." (Citation omitted; internal quotation marks omitted.) Id. In such situations, any ambiguity inures to the benefit of the defendant, as it establishes the first prong of a double jeopardy analysis, which inquires as to whether the charges must arise out of the same act or transaction. See *State* v. *Bernacki*, 307 Conn. 1, 9, 52 A.3d 605 (2012), cert. denied,      U.S.     , 133 S. Ct. 1804, 185 L. Ed. 2d 811 (2013). Moreover, any ambiguity in the acts alleged has no bearing on the second prong of a double jeopardy analysis, which is "theoretical in nature and not dependent on the actual evidence adduced at trial." Id., 21 n.16. That second prong entails "a technical analysis of the statutory elements," rather than a focus "on the facts of the case." Id., 22 n.16. As such, the resolution of any alleged ambiguity in facts alleged in the informations and proffer by the state was not necessary for the defendant to prepare such a defense.[11] We therefore cannot conclude that the court improperly denied his motion for a bill of particulars.

II

The defendant next contends that certain convictions violate the prohibition against double jeopardy. The defendant did not preserve this claim at trial and now seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We review the defendant's claim because the record is adequate for review and the claim is of constitutional magnitude. See *State* v. *Alvaro F.*, 291 Conn. 1, 5 n.8, 966 A.2d 712, cert. denied, 558 U.S. 882, 130 S. Ct. 200, 175 L. Ed. 2d 140 (2009).

"[A] defendant's double jeopardy claim presents a question of law, over which our review is plenary."

*State* v. *Burnell*, 290 Conn. 634, 642, 966 A.2d 168 (2009). The double jeopardy clause of the fifth amendment to the United States constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb . . . ." That constitutional provision is applicable to the states through the due process clause of the fourteenth amendment. *Benton* v. *Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969). The double jeopardy prohibition "serves three separate functions: (1) It protects against a second prosecution for the same offense after acquittal . . . [2] It protects against a second prosecution for the same offense after conviction . . . [3] And it protects against multiple punishments for the same offense [in a single trial]." (Internal quotation marks omitted.) *State* v. *Crawford*, 257 Conn. 769, 776, 778 A.2d 947 (2001), cert. denied, 534 U.S. 1138, 122 S. Ct. 1086, 151 L. Ed. 2d 985 (2002). The latter function is at issue in the present case.

"Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met." (Internal quotation marks omitted.) *State* v. *Bernacki*, supra, 307 Conn. 9. With that standard in mind, we turn to the defendant's specific claims.

A

The defendant argues that his convictions for interfering with an officer in violation of § 53a-167a and attempt to commit assault of public safety personnel in violation of §§ 53a-49 and 53a-167c violate his right against double jeopardy. That claim fails because those charges did not arise out of the same act or transaction.

In her oral proffer in response to the defendant's motion for a bill of particulars, the state's attorney averred that the interfering charge stemmed from the defendant's refusal to release Tyler from the house, his noncompliance with the order to surrender his weapon upon exiting the house, and his conduct in resisting arrest. The state's attorney also averred that the attempted assault charge stemmed from an incident in which the defendant fired gunshots in the direction of SWAT team members outside the house. The evidence adduced at trial[12] substantiated those allegations and indicated that, during his standoff with law enforcement after Tyler escaped from the house, the defendant "fired two rounds to the back of the yard in the vicinity" of numerous officers and members of a SWAT team before returning inside the house.

By contrast, the acts underlying the interfering charge plainly transpired at distinct and different times than the attempted assault. The defendant's conduct in refusing to comply with police instructions to release Tyler,

a fortiori, occurred prior to her escape from the house, and thus before he fired gunshots at the officers outside. Likewise, his refusal to drop his gun and to submit to arrest upon exiting the house occurred well after he fired on the officers and then retreated into the house. We therefore cannot say that the charges for interfering with an officer in violation of § 53a-167a and attempt to commit assault of public safety personnel in violation of §§ 53a-49 and 53a-167c arise out of the same act or transaction. His claim thus fails under *Golding*'s third prong.

B

The defendant also claims that his two convictions for threatening in the second degree in violation of § 53a-62 (a) (1) and (2), respectively, violate his right against double jeopardy. We disagree.

In her oral proffer, the state's attorney alleged that the violation of § 53a-62 (a) (1) arose from the defendant's physical threat to Tyler as he ordered her into the basement. At trial, Tyler testified that the defendant struck her on the head, knocking her to the ground and causing her to believe that he had "cracked open [her] head." Soon thereafter, the defendant dragged her toward the basement. When she resisted, the defendant stated, "you get up and get down there or I'll throw you down the stairs." In light of that testimony, the jury reasonably could have concluded that the defendant placed Tyler in fear of imminent serious physical injury by that physical threat.[13]

Conversely, the state's attorney's proffer indicated that the alleged violation of § 53a-62 (a) (2), which she described as "the verbal threatening" charge, arose from the defendant's repeated threats, made during his negotiations with the police, that he would kill Tyler and blow up the house. Those negotiations were distinct from his conduct in forcing Tyler into the basement. Accordingly, we conclude that the defendant's two convictions for threatening in the second degree in violation of § 53a-62 (a) (1) and (2) do not arise from the same act or transaction.

In addition, the crimes set forth in § 53a-62 (a) (1) and (2) do not constitute the same offense. To ascertain whether two crimes constitute the same offense, we engage in "a technical analysis of the statutory elements" and not the "facts of the case." *State* v. *Bernacki*, supra, 307 Conn. 22 n.16. Section 53a-62 (a) (1) provides in relevant part that "[a] person is guilty of threatening in the second degree when . . . [b]y physical threat, such person intentionally places or attempts to place another person in fear of imminent serious physical injury . . . ." Section 53a-62 (a) (2) provides in relevant part that "[a] person is guilty of threatening in the second degree when . . . such person threatens to commit any crime of violence with the intent to terrorize

another person . . . ."

The plain language of § 53a-62 (a) (1) requires proof of two elements not present in § 53a-62 (a) (2). First, the state must establish that a defendant made a physical threat that placed another person in fear of physical injury.[14] Section 53a-62 (a) (2) contains no such requirement. Indeed, a defendant could violate that statute by verbally threatening to blow up another person's house while they are out of town. Such an act neither contains a physical threat against the person nor instills fear of serious physical injury to that person.

Second, § 53a-62 (a) (1) contains a temporal requirement in that the threat communicated to another person must place them in fear of imminent serious physical injury. By contrast, § 53a-62 (a) (2) includes no such limitation. See *State* v. *Carter*, 141 Conn. App. 377, 401, 61 A.3d 1103 (noting that imminence not requirement in context of threat made pursuant to § 53a-62 [a] [2]), cert. granted on other grounds, 308 Conn. 943, 66 A.3d 886 (2013). As a result, it is possible for a defendant to violate § 53a-62 (a) (1) by intending to place another person in fear of imminent serious physical injury without also violating § 53a-62 (a) (2). We therefore reject the defendant's contention that he has been punished twice for the same offense. His convictions for violating § 53a-62 (a) (1) and (2) do not run afoul of the prohibition against double jeopardy. Accordingly, the defendant cannot prevail under *Golding*.

### III

The defendant lastly alleges instructional error. He claims that the court's charge on the defense of mental disease or defect[15] misled the jury into believing that, if acquitted on that basis, the defendant likely would be released from confinement prematurely.[16] We do not agree.

"[I]n evaluating a claim of instructional impropriety, we must view the court's jury instructions as a whole, without focusing unduly on one isolated aspect of the charge. . . . In determining whether a jury instruction is improper, the charge . . . is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect on the jury in guiding [it] to a correct verdict in the case. . . . In addition, the defendant bears the burden of demonstrating that it is reasonably possible that the jury was misled by the charge." (Citations omitted; internal quotation marks omitted.) *State* v. *Carrion*, 313 Conn. 823, 845,       A.3d (2014).

In its charge, the court instructed the jury on the affirmative defense of mental disease or defect, detailing the elements thereof and the defendant's burden of proof with respect thereto. The court then instructed the jury on the consequences of such an acquittal.[17] It

stated: "I must also inform you of the consequences for the defendant if he is found not guilty by reason of lack of capacity due to mental disease or defect, and of the applicable confinement and release provisions of the law. A defendant who has been found not guilty by reason of lack of capacity due to mental disease or defect is referred to as an acquittee.

"The confinement provision requires the court to commit the acquittee to the Commissioner of Mental Health and Addiction Services for temporary confinement in a state hospital for an examination to determine his mental condition. Within forty-five days of the order of commitment, the superintendent of that hospital must file a report concerning the mental condition of the acquittee with the court.

"After receipt of this report, either party will have an opportunity to have another examination of the acquittee. The court will conduct a hearing to determine the mental condition of the acquittee with the primary concern being the protection of society. After the court hears the evidence, the court will determine if the acquittee should be confined, conditionally released, or discharged. A finding that the acquittee should be confined or conditionally released will result in an order committing the acquittee to the Psychiatric Security Review Board for confinement in a state mental institution for custody, care, and treatment pending a hearing by the Psychiatric Security Review Board within ninety days of the order.

"This court shall fix a maximum period of confinement authorized for the crime for which he was found not guilty by reason of lack of capacity due to mental disease or defect. If the court determines that a conditional release is warranted, the court shall so recommend to the Psychiatric Security Review Board.

"However, if the evidence indicates that the defendant is not a threat to himself or others, and that the protection of society would not be adversely effected by his release, the court may discharge the acquittee from further custody.

"If there are changes in the acquittee's condition from the first report, the court will hold another hearing to determine whether to continue the acquittee's commitment, to conditionally release him or to discharge him. The law provides that if the acquittee is again confined to a state hospital, the Psychiatric Security Review Board retains jurisdiction over him, and during his period of confinement the superintendent of the state hospital will have to report to the board at least every six months as to his condition.

"If conditions change, the board could, on its own, conditionally release him or recommend to the court that he be released unconditionally. The court, during the course of any commitment of a person found not

guilty by reason of lack of capacity due to mental disease or defect, always maintains supervision of that person. At any time the superintendent of the mental hospital may recommend to the board that the acquittee be released. This will result in a hearing before a judge.

"In summary, the law provides that there be an initial commitment and hearing, and, depending on the evidence presented, the acquittee will either be discharged or committed. If the acquittee is committed, this decision will be reviewed after ninety days and every six months after that, as the intention is to hold someone only until such point as he is no longer a danger to himself or others and that society is, in fact, protected.

"Now, that concludes the court's instruction with reference to the defense of mental disease or defect. It applies to each of the charges presented, and must be considered during the deliberation for each specific charge."

General Statutes § 54-89a mandates the inclusion of such a charge on the consequences of an acquittal due to mental disease or defect. It provides: "If the court instructs the jury on a defense of mental disease or defect raised pursuant to section 53a-13, it shall, unless the defendant affirmatively objects, inform the jury of the consequences for the defendant if he is found not guilty by reason of mental disease or defect and of the confinement and release provisions of sections 17a-580 to 17a-602, inclusive, applicable to a person found not guilty by reason of mental disease or defect."[18] General Statutes § 54-89a.

Our Supreme Court has explained that "[a]t common law, the matter of punishment was not an issue for the jury but for the court, and therefore not an appropriate subject for the jury's consideration or for the court's instruction to the jury. . . . Section 54-89a, enacted in derogation of this common law principle, is to be construed narrowly in order to leave undisturbed those aspects of the common law not directly affected by the statute. . . . Section 54-89a requires only that the court inform the jury of the consequences that may follow a verdict rendered after a successful insanity defense. It does not nullify the general rule that a jury base [its] verdict solely on the evidence before it. A narrow construction of § 54-89a comports with this general rule by ensuring that the jury possesses information that enables it to reach a determination based on the evidence, yet remains unaffected by sympathy, fear or other inappropriate and irrelevant concerns." (Citations omitted; emphasis omitted.) *State* v. *Wood*, 208 Conn. 125, 144, 545 A.2d 1026, cert. denied, 488 U.S. 895, 109 S. Ct. 235, 102 L. Ed. 2d 225 (1988).

The court's charge on the consequences of an acquittal due to mental disease or defect furthered that aim, providing proper guidance as to the confinement and

release provisions applicable to such acquittees. See *State* v. *Cole*, 50 Conn. App. 312, 327, 718 A.2d 457 (1998) ("the effect of the court's instructions [pursuant to § 54-89a] was to inform the jury of the consequences of a successful insanity defense"), aff'd, 254 Conn. 88, 755 A.2d 202 (2000). The charge was identical to the model jury instruction provided by the Judicial Branch website. See Connecticut Criminal Jury Instructions § 2.9-2 (4th Ed. 2007), available at http://www.jud.ct.-gov/JI/criminal/part2/2.9-2.htm (last visited November 28, 2014). As our Supreme Court has noted, "[w]hile not dispositive of the adequacy of the jury instruction, an instruction's uniformity with the model instructions is a relevant and persuasive factor in our analysis." (Internal quotation marks omitted.) *State* v. *Ebron*, 292 Conn. 656, 688 n.27, 975 A.2d 17 (2009), overruled in part on other grounds by *State* v. *Kitchens*, 299 Conn. 447, 472–73, 10 A.3d 942 (2011); see also *State* v. *Sanchez*, 84 Conn. App. 583, 592 n.10, 854 A.2d 778, cert. denied, 271 Conn. 929, 859 A.2d 585 (2004).

The defendant nonetheless argues that the court's instruction improperly identified specific time frames for an acquittee's initial confinement. Inclusion of those time frames, he argues, "gave [the jury] the impression of a likelihood of release" if it returned a verdict of not guilty by reason of mental disease or defect, particularly in light of the state's rebuttal of that defense. The defendant claims that the court could have alleviated that impropriety by "omitting the time periods and informing the jury that if, at the end of the term of commitment, he remained a threat to himself or others and the protection of society would be adversely affected by his release, the defendant would . . . remain committed." For three reasons, that argument is unconvincing.

First, one of the dictates of § 54-89a is that the court instruct the jury "of the confinement and release provisions . . . applicable to a person found not guilty by reason of mental disease or defect." Inclusion of the specified time periods in the court's charge comports with that requirement, and the defendant has provided this court with no authority—nor are we aware of any—proscribing the inclusion thereof.

Second, a review of the record indicates that the state, in rebutting the defendant's affirmative defense of mental disease or defect, did not argue that the defendant would be released prematurely if acquitted on that basis. Rather, the state argued that the jury should reject that defense because the evidence submitted at trial showed that the defendant suffered from no mental disease or defect and had a history of fabricating such illness. For example, the state introduced evidence that the defendant voluntarily admitted himself to Manchester Memorial Hospital in the midst of the dissolution proceeding in March, 2008, when he allegedly was contemplating suicide. The next morning, the defendant

informed hospital staff that he was not suicidal, and he displayed no suicidal symptoms whatsoever. He then was discharged from the hospital after informing hospital staff that his admission was simply a ploy to avoid a court hearing the following day. The state likewise introduced into evidence a recording of a telephone call the defendant placed to a friend from MacDougall-Walker Correctional Institution on January 30, 2010.[19] In that call made approximately six months after his arrest, the defendant stated that his attorney advised him that the state likely would accept his plea of not guilty by reason of insanity. He referred to that defense as a "temporary insanity thing." When asked whether that plea would result in any punishment, the defendant replied, "Well they'll send me to Whiting [Forensic Division of Connecticut Valley Hospital] for evaluation to see if I'm a danger to society, but [my attorney] says I'll be out in six to nine months, [my] psychiatrist says the same thing." Later in the call, the defendant marveled at the fact that, if his plea was accepted and he subsequently was released into society, his criminal record allegedly would be expunged completely.

Such evidence was offered to rebut the defendant's claim, as articulated during his closing argument, that he suffered from "various mental disorders" that caused a "psychotic break with reality" and his "insane conduct" on July 7, 2009. Put differently, the state's rebuttal sought to demonstrate that the elements of the affirmative defense were not satisfied. For that reason, the state's attorney argued that the defendant "was an angry man and not an insane man on the date in question," and that "there's absolutely no credible evidence he was in a psychotic state" at that time. She argued that the defendant deliberately was "playing the mental illness card once again in order to get out of criminal responsibility for these charges," and submitted that "that's what he's counting on ladies and gentlemen, that he puts on this act for you, that you buy it and off he goes to Whiting and then makes a miraculous recovery like he did at Manchester Memorial Hospital; don't buy his act ladies and gentlemen." In so doing, the state merely reminded the jury that an acquittee likely will not remain committed if the acquittee no longer suffers from any mental disease or illness. That sentiment is consistent with the applicable provisions of the General Statutes, as well as the court's charge to the jury on the consequences of an acquittal.

Third, and most significantly, the charge emphasized to the jury that "[t]he court, during the course of any commitment of a person found not guilty by reason of lack of capacity due to mental illness or defect, *always maintains supervision* of that person." (Emphasis added.) The court also apprised the jury that the "intention" of an acquittee's confinement is to ensure "that society is, in fact, protected," and that the court's supervision over an acquittee continues "until such point"

as that interest is secured in the event of an acquittee's release. Those instructions properly conveyed to the jury the fact that, if the defendant suffered from a mental disease or defect and was acquitted, he would not be released until he no longer was a threat to society. They likewise indicated that, if the defendant did not truly suffer from such a disease, he may not remain committed. As such, the charge complied with the dictates of § 54-89a.

Viewed as a whole, we conclude that it was not reasonably possible that the jury was misled into believing that the defendant, if acquitted due to mental disease or defect, would be released from confinement prematurely. He therefore has not sustained his burden of establishing instructional error.

The judgments are affirmed.

In this opinion the other judges concurred.

[1] The protective order prohibited the defendant from, inter alia, possessing any firearms, from imposing any restraint upon Tyler, from threatening or assaulting her, from coming within 100 yards of her, or from "having any contact in any manner" with her.

[2] Chief Tyler bore no relation to the victim, Nancy Tyler. He passed away shortly before the defendant's trial.

[3] Reed testified that the Capital Region Emergency Services Team was comprised of officers from many of the Hartford region police departments and constituted South Windsor's "critical incident response team, our tactical team, our SWAT team, our crisis negotiators, and our police dive team."

[4] Prior to their divorce, the defendant claimed to be terminally ill with cancer. Tyler became suspicious about that allegation when "there were no doctor visits, there was no report. I continually asked can I go with you, can I help you. . . . He always refused . . . and then after that he had several other bouts of illnesses that appeared not to be real." The defendant never produced any evidence whatsoever to Tyler indicating that he had cancer.

[5] Tyler testified that she did not know what a propane pocket was and that the defendant informed her that it was an area that "will burn or it will explode if anybody breaches it."

[6] The robot was deployed by the police in an effort to deliver a "throw phone" to the defendant to maintain a line of communication and alleviate concerns about poor cell phone coverage.

[7] At trial, Jack Hubball, a chemist at the state forensic science laboratory, testified that flames produced by burning propane are blue in color.

[8] "A Taser is a type of controlled electronic weapon capable of firing wires tipped with a pair of barbed darts to deliver a paralyzing electric charge." *State* v. *Daniel G.*, 147 Conn. App. 523, 573 n.11, 84 A.3d 9 (*McDonald, J.*, concurring in part and dissenting in part), cert. denied, 311 Conn. 931, 87 A.3d 579 (2014).

[9] Mainieri testified that a dry stun is administered by placing a Taser on "somebody's skin and [making] direct contact with the device directly to their skin or their body . . . ."

[10] The defendant renewed his objection in his subsequent motion for a new trial, arguing in relevant part that the informations "were unbelievably vague and unbelievably incomplete and did not give fair notice as to what, specifically, with respect to when, where and how the defendant violated this specific statute . . . ." The court denied that motion.

[11] To be clear, we perceive no such ambiguities, as discussed more fully in part II of this opinion.

[12] In analyzing whether certain charges arise out of the same act or transaction, our Supreme Court repeatedly has examined the evidence submitted at trial. See, e.g., *State* v. *Brown*, 299 Conn. 640, 653–54, 11 A.3d 663 (2011); *State* v. *Kulmac*, 230 Conn. 43, 67–69, 644 A.2d 887 (1994).

[13] We note that the defendant in this appeal does not challenge the sufficiency of the evidence with respect to any of his convictions.

[14] As the model jury instruction for § 53a-62 (a) (1) from the Judicial Branch website explains: "A threat is the expression of an intention to injure

another person. A physical threat is a threat accompanied by some action, such as words accompanied by a threatening gesture. A physical threat may also occur if the defendant expresses the threat in the person's presence and has the apparent ability to carry out (his/her) threat. Mere words are insufficient to constitute a physical threat; the defendant must also indicate by (his/her) actions an intent or an ability physically to carry out that threat. The conduct of a person, even without words, may be sufficient to cause fear in another person." Connecticut Criminal Jury Instructions § 6.2-3 (4th Ed. 2009), available at http://www.jud.ct.gov/JI/criminal/part6/6.2-3.htm (last visited November 28, 2014).

[15] General Statutes § 53a-13 (a) provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

[16] This claim is properly preserved for review, as the defendant requested an alternate instruction during the charging conference, and thereafter memorialized his objection after the court completed its charge to the jury.

[17] The defendant does not challenge the court's instructions with respect to the affirmative defense of mental disease or defect. Rather, his claim pertains to the portion of the charge instructing the jury on the consequences of an acquittal on that basis.

[18] Although the defendant objected to the court's charge, he does not dispute that the court retained discretion in such instances to overrule the objection and to deliver a charge consistent with the dictates of § 54-89a. At oral argument before this court, his counsel clarified that the defendant was not claiming that the trial court violated that statute, but rather that the inclusion of this instruction misled the jury.

[19] The January 30, 2010 telephone call was played for the jury at trial.